Robert M. McKINNEY, Plaintiff,

v.

GANNETT CO., INC., a corporation,
and the New Mexican, Inc., a
corporation, Defendants.

No. CIV–78–630 C.

United States District Court,
D. New Mexico.

March 17, 1981.

Supplemental Memorandum Opinion
Aug. 25, 1981.

988

W.A. Sloan, Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, N.M., for plaintiff.

Nixon, Hargrave, Devans & Doyle, John B. McCrory, Robert C. Bernius, Rochester, N.Y., Jones, Gallegos, Snead & Wertheim, Jerry Wertheim and John Wentworth, Santa Fe, N.M., Ortega & Snead, Albuquerque, N.M., for defendants.

## MEMORANDUM OPINION

CAMPOS, District Judge.

THIS CASE was heard by the Court sitting with a jury during the period from March 24, 1980, to June 26, 1980; the jury returned special verdicts on June 27, 1980, finding for Plaintiff on all five claimed breaches of contract and for Defendants on the fraud claim. My independent findings and conclusions are consistent with the jury's verdicts and are more particularly set forth below. Based on these, I will order that Plaintiff, if he elects to have it so after the accounting, may have rescission of the transaction consummated by the parties in February of 1976. An accounting also will be ordered. Rescission shall be on terms set after the accounting. The reason for extending Plaintiff the option to rescind or not to rescind after the accounting will be explained subsequently.

Plaintiff is Robert M. McKinney ("McKinney"), a citizen of the State of Virginia. He filed suit on September 1, 1978, against Gannett Co., Inc. ("Gannett"), a Delaware corporation, with its principal place of business in Rochester, New York, and against The New Mexican, Inc. ("The New Mexican"), a New Mexico corporation. Jurisdiction is based on diversity.

In his First Amended Complaint, McKinney sought rescission of the contract by which he had conveyed his ownership of The New Mexican to Gannett plus an accounting and $5 million incidental and consequential damages. He also sought "legal damages", or actual and compensatory damages, in the amount of $10 million against both Gannett and The New Mexican. Finally, McKinney prayed for exemplary or punitive damages in the amount of $10 million.

As a basis for these remedies, McKinney alleged eleven causes of action against Gannett and The New Mexican: breach of contract, federal securities fraud, fraud and deceit, constructive fraud, negligent misrepresentation, meeting of the minds, inducing breach of contract, interference with prospective advantage, conspiracy, unjust enrichment and breach of duty of good faith. By my rulings on pre-trial motions

and my rulings during the trial, I dismissed all but the breach of contract claim and the claim of fraud and deceit.

Gannett answered, denying any wrongdoing and asserting eight affirmative defenses. The New Mexican answered, also denying any wrongdoing and asserting 26 affirmative defenses. At the trial, I submitted only two affirmative defenses for consideration by the jury: waiver, and legal excuse for the alleged breaches of contract.

The New Mexican, by way of counterclaim, sought judgment against McKinney for $100,000 compensatory damages and $1 million punitive damages for his alleged wrongful acts and breaches of contract. After hearing all testimony, I dismissed The New Mexican's counterclaim.

A jury was demanded by McKinney and by The New Mexican. Because of the estimated length of trial, five weeks, a jury consisting of six regular and four alternate jurors was empaneled.

STATEMENT OF THE CASE

For many years prior to February 27, 1976, McKinney owned, either directly or through his personal holding company (El Nuevo Mexicano, Inc.), all of the stock of The New Mexican, which publishes *The New Mexican*, the only daily newspaper in Santa Fe, New Mexico. He held the highest position of authority at the newspaper, that of publisher. McKinney held many other positions with other corporations and government agencies, and frequently was away from Santa Fe. He maintained an apartment in New York City as well as a residence in New Mexico. To manage the day-to-day affairs of the newspaper, McKinney employed a general manager. Reporting to the general manager were the department heads, to whom the departmental staff were directly responsible.

Gannett is a large newspaper group or chain which owns over 80 newspapers as well as several radio and television stations.

In 1975 McKinney negotiated with Gannett for the transfer of all the shares of common stock of The New Mexican to Gannett in return for 300,000 shares of Gannett common stock. These negotiations culminated in an "Agreement and Plan of Reorganization" dated as of December 18, 1975, which agreement was to be supplemented and closed at a later time. Signatories to the agreement are Gannett on the one hand and McKinney, El Nuevo Mexicano, and The New Mexican on the other. That agreement was closed on February 27, 1976. During the interim, several issues had to be resolved and several documents prepared or finalized. Prior to the closing, McKinney and The New Mexican had agreed to the terms of an "Employment Agreement." These are contained in Plaintiff's Exhibit 505, attached hereto. Under the Employment Agreement, McKinney retained certain rights and responsibilities at the newspaper for a term of 10 years and certain others for a term of 5 years. The transactions between Gannett and McKinney of February 1976 included the acquisition by Gannett of *The Taos News*, a newspaper published at Taos, New Mexico. The reasons for this acquisition and the general terms thereof are treated elsewhere in this opinion. (See pp. 18–19)

This lawsuit concerns the promises contained in the Employment Agreement. McKinney claims Gannett and The New Mexican breached that contract on several occasions. He also claims that Gannett defrauded him by entering into the Agreement and Plan of Reorganization with the intention not to fulfill its contractual obligations and undertakings contemplated by that Agreement and that The New Mexican participated in that fraud later on down the line. Because Gannett was not a party to the Employment Agreement, McKinney seeks to hold it liable for breach of contract by several theories: that The New Mexican was the alter-ego of Gannett, that Gannett induced The New Mexican to commit breaches, and that Gannett and The New Mexican conspired to breach McKinney's contract.

The New Mexican by its counterclaim avers that McKinney breached the Employment Agreement on several occasions and committed other wrongful acts, resulting in damage to The New Mexican.

## DISCOVERY MATTERS

Shortly after McKinney filed this lawsuit, the Board of Directors of The New Mexican met and effectively removed McKinney's authority at The New Mexican pending this litigation. During pre-trial discovery, Gannett took the position that information about any events which occurred after McKinney's suspension was not discoverable. McKinney applied to the magistrate for relief, contending that under the liberal rules of discovery such information should be compelled. After an adverse ruling by the magistrate, McKinney appealed to this Court in a Motion to Reconsider the magistrate's order. He argued that even after removal of his authority at The New Mexican, subsequent acts taken by Gannett and The New Mexican could constitute separate breaches of his contract. He also argued that information about events occurring after his removal was relevant to the issue of punitive damages and to the issue of fraud.

■■■ Under Rule 26, Federal Rules of Civil Procedure, there is no bar against discovery of information about events occurring after the filing of a complaint. It is my view that while events occurring after McKinney's authority was removed might not constitute separate breaches of the Employment Agreement, such events may shed light on prior events. Thus, the information is discoverable because it may be admissible at trial or lead to admissible evidence.

The order of the magistrate denying discovery of information subsequent to the filing of the complaint was, therefore, set aside and the parties were directed to proceed under the rules of discovery without any arbitrary cut-off dates.

Another serious discovery matter came up late in the trial. After McKinney had rested, Gannett called as its next witness Larry Miller, Gannett's controller and vice president in charge of accounting. Through Miller, Gannett sought to introduce into evidence certain internal Gannett financial statements and comparisons of The New Mexican with other newspapers, Defendants' Exhibits GK–31, 33–36 and GX–45, 46. McKinney objected on the basis that these documents had not been produced during discovery despite requests for production covering this type of document. I ruled that Miller could not testify about the documents until a complete set was provided to McKinney, and scheduled a hearing the next day to determine whether these documents were in fact called for by McKinney's requests. Gannett attorneys then attempted to withdraw their offer of the exhibits and suppress them from being seen by McKinney's attorneys on the ground that they contained "sensitive financial data". McKinney pressed for discovery, and convinced me that the documents had clearly been called for in requests for production.

■■■ Gannett argued that the burden was on McKinney to request specific documents if they were not produced. This is not the intent of the rules of discovery. A party seeking discovery of documents is often unable to request them specifically, and a general request is all that is required. Gannett attorneys then asserted that they were not produced because the attorneys had never seen the documents. However, it turned out that at least one of Gannett's attorneys had actually discussed these particular documents with Miller in reference to McKinney's requests. The discussion on non-production then shifted to McKinney's former general manager, Stephen Watkins, who had received some of these documents on a monthly basis. Gannett reasoned that since Watkins had seen some of the documents, he should have had McKinney request the specific documents by name, despite the existence of a general request. This type of pre-trial denial of discovery is abhorrent in our current system of civil procedure. Sensitive documents may not be suppressed from discovery. Rather, appropriate orders and stipulations can protect such documents from reaching the public. In fact, a confidentiality stipulation had been agreed to in this case quite early on in the proceedings, and an order to that effect signed by the Court.

I ordered Gannett to produce all these documents as soon as possible. I further ordered Miller to get together with McKinney's attorneys to discuss other relevant documents which may not have been produced because they were sensitive or not asked for specifically, and to produce such documents taking a liberal view of the requests for production by McKinney. I did not impose sanctions *sua sponte*, nor did McKinney's attorneys move for sanctions, but it was felt that this type of cat-and-mouse game played by Gannett could have justified sanctions. McKinney's attorneys were ordered not only to keep these documents confidential pursuant to the stipulated confidentiality order, but were further ordered not to show them to any non-party not connected with their law office until further order of the Court, not even to their newspaper expert, John Malone.

## BIFURCATED TRIAL

Gannett moved for a bifurcated trial. McKinney agreed, and a pre-trial order was entered to this effect. The issues of liability and damages for fraud and breach of contract were to be tried first, to a jury. The Court would then, if necessary, decide whether rescission would be ordered. If rescission were appropriate, the second phase of the trial would address any accompanying accounting for profits between the parties, as well as damages ancillary to rescission and punitive damages.

## RIGHT TO TRIAL BY JURY

■ Phase 1. Since McKinney initially sought "legal damages" for fraud and breach of contract, there was no question about his right to jury trial. Similarly, The New Mexican asserted a counterclaim in which it sought legal damages. Thus, at least for the first phase of the trial, the parties' right to a jury trial was undisputed.

At the close of his case, however, McKinney waived his claim for legal damages and made a firm election for the equitable remedy of rescission. This posed a dilemma for the Court. It was clear that having proved no damages other than nominal damages which could be submitted to a jury, and having opted for rescission or nothing, McKinney was no longer entitled to a jury trial. In fact, McKinney had earlier in the trial waived any right to a jury he might have had. Gannett and The New Mexican continued to demand a jury throughout the trial. The New Mexican continued to assert its right to jury on the counterclaim.

The rule is that where there is a compulsory counterclaim which is legal, then the common factual issues must be tried to a jury even though the complaint seeks only equitable relief. *Beacon Theatres v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); 5 Moore's Federal Practice Para. 38.14 (2d ed. 1978). The counterclaim in this case was undoubtedly compulsory under Rule 13(a), Federal Rules of Civil Procedure. It alleged, among other things, breaches by McKinney of the Employment Agreement, just as McKinney's complaint alleged breaches of the Employment Agreement by Gannett and The New Mexican. Thus, it arose out of the transaction or occurrence that is the subject matter of the complaint. It was, therefore, determined that Gannett and The New Mexican still enjoyed a right to the jury, at least on the issues involved in the counterclaim.

At the close of all the testimony, I dismissed The New Mexican's counterclaim, for reasons discussed below. Thus, the Court was left with a complaint seeking only equitable relief. Of course, McKinney had argued all along that he was entitled to some money damages ancillary to rescission as well as an accounting for income and punitive damages. But those items had been reserved for the second phase of the trial, and it has now been determined there is no right to a jury on that phase either (Phase 2 will be discussed in a separate memorandum). All that remained to be decided in Phase 1 was whether Gannett and The New Mexican were liable for five claimed breaches of the Employment Agreement and for fraud, and if so, whether rescission or some other remedy were appropriate. Thus the question reappeared as to whether there was a right to have any of these issues determined by a jury.

It is my opinion that under these circumstances there was no right to a jury on Phase 1 of the trial. Rather than dismiss the jury at the close of all the testimony (some 57 trial days) and risk reversal on this point, it was decided to allow the jury to pass on whether there had been breaches of contract and fraud. This was done by means of six special verdicts, one for each of five claimed breaches and one for fraud. It was decided to treat these jury verdicts as advisory only, pursuant to Rule 39(c), Federal Rules of Civil Procedure. I would then make independent findings of fact, conclusions of law, and order the appropriate remedy, if any. This procedure has been suggested by Professor Moore in 5 Moore's Federal Practice Para. 38.18 (2d ed. 1978). *See, Hargrove v. American Cent. Ins. Co.*, 125 F.2d 225 (10th Cir.1942). It seems a wise procedure, designed to preclude the necessity of a remand for a new trial in the event of trial court error on the issue of right to a jury.

The Court has opted for this cautionary procedure because of the uncertainty on the issue of the right to trial by jury. If McKinney had prayed only for rescission from the beginning, and there had been no counterclaim, the Court may not have empanelled a jury at all. But McKinney's waiver of legal damages came late in the trial, after the Court had made several rulings and after the parties had had an opportunity to view the jury for several weeks. Possibly, it could be deemed an abuse of the system to "test the waters" in this way before dropping one's legal claim, thus, depriving the other party of its right to a jury trial.

SUMMARY JUDGMENT

There were numerous pre-trial motions filed in this case. Among them was a Motion for Partial Summary Judgment filed by McKinney on January 31, 1980, in which McKinney argued that there was no material question of fact in dispute and that he was entitled to judgment as a matter of law with respect to four specific claimed breaches of the Employment Agreement by Gannett and The New Mexican.

By letter of March 18, 1980, I informed counsel I would find and conclude that there remained genuine issues of material fact with respect to three of the alleged breaches of contract. But with respect to one of the claimed breaches, there was a clear breach of the Employment Agreement, and none of the affirmative defenses of either Gannett or The New Mexican was sufficient to raise a question of fact in regard to that breach.

The clear breach concerned political endorsements for the New Mexico partisan primary elections in early June 1978. On June 4, 1978, The New Mexican published an editorial endorsing Bruce King in the Democratic primary and Joe Skeen in the Republican primary, but criticizing King for not addressing the issues. The critical portion of the editorial read:

We admit disappointment with King's performance in the primary. He has not met his campaign opponent head-on, has not addressed any of the campaign issues and prefers to stress his past record rather than raise any new issues of his own.

Considering his record and his achievements in office, he could be much more forceful in addressing the state's problems for the thousands of Democratic voters who have moved into the state since 1970 and do not know him.

He will have to do this before the general election. (Plaintiff's Exhibit 225.)

On April 13, 1978, McKinney had met in Santa Fe with Robert Storey (the editorial page editor), Barclay Jameson (the managing editor), and N. Walter Ryals (the general manager). At that time McKinney let it be known that he wished to endorse Bruce King in the upcoming election. Later in April, Storey and McKinney had further discussions about the governor's race. Storey said that the candidates were not addressing the issues of right to work laws, state funding of abortions, and the Waste Isolation Pilot Project (WIPP). McKinney replied that these were really nonissues, and that it was probably better if King was not specific on them.

In response to a McKinney instruction, Storey and Jameson prepared a draft editorial. The draft was critical of King for not addressing the issues during the campaign. Storey read this draft to McKinney on May 22, 1978, over the telephone, as McKinney was in New York City preparing to leave for Europe. McKinney directed Storey to delete the criticism. Storey rewrote the editorial with the criticism toned down and read it to McKinney on May 23, 1978. Again McKinney directed Storey to delete the criticism of King. After discussion among Storey, Jameson and Ryals, it was decided to publish the editorial as last written, including the language above quoted criticizing King, which language McKinney had clearly ordered be deleted. The next day Storey informed McKinney that the editorial would not be changed as McKinney had directed. McKinney was referred by Storey to Ryals who reiterated that the editorial would not be changed and suggested to McKinney that local people should decide on or have input on local political endorsements, consistent with the editorial policy of Gannett and other newspapers throughout the country.

McKinney claims that this failure to follow his instructions concerning the endorsement editorial is a breach of the Employment Agreement. He points to Paragraph 3B, which reads:

Subject only to such news and editorial department budget limitations as may be established by the Publisher of such publications and the Board of Directors, as Editor-in-Chief, the Employee (referring to McKinney) shall be in complete charge of news and editorial policies of all publications presently published by the Company. He shall direct, supervise and oversee all news and editorial operations of such publications with complete authority over all news and editorial employees, subject only to such news and editorial department budgeting limitations as may be established by the Board of Directors of the Company and the Publisher of such publications....

Elsewhere in the Employment Agreement it is stated that McKinney will hold the position of Editor-in-Chief for a term of ten years from February 27, 1976, unless he becomes incapacitated. Because that term had not expired and because McKinney was not incapacitated, Paragraph 3B was in force in May and June 1978 when the controversy about the editorial arose and came to a head.

I am of the opinion that the meaning of this provision of the Employment Agreement is clear and unambiguous. The interpretation of an unambiguous contract is a question of law for the court. *Southwest Motel Brokers, Inc. v. Alamo Hotels, Inc.,* 72 N.M. 227, 382 P.2d 707 (1963); *Stewart v. Brock,* 60 N.M. 216, 290 P.2d 682 (1955). The foregoing facts are uncontroverted, thus, summary judgment is an appropriate approach to this issue.

The only limitations on McKinney's otherwise absolute editorial authority at The New Mexican are budgetary. It is inconceivable that budgetary limitations could affect McKinney's right to decide the wording and tone of an endorsement editorial, but I need not even reach that question. From the record presented on motion for summary judgment, it is clear that no news or editorial department budgetary limitations had been imposed by the Board of Directors of The New Mexican. Thus, there were *no* valid limitations on McKinney's editorial control, and the refusal to carry out his directives regarding the King editorial was wrongful and constituted a deliberate breach of the Employment Agreement.

The New Mexican filed a Motion for Reconsideration of this decision in open court on March 24, 1980, which motion I denied. No new facts were brought to my attention, and the arguments presented nothing new.

At trial, I announced my decision on that breach to the jury. Gannett and The New Mexican had argued long and hard that I should put off disclosing this to the jury, and ultimately that it should only be disclosed during instructions at the close of the case. I put off disclosure as long as possible but it became necessary at some point to explain this to the jury. The jury

was to decide the issue of damages, and in order for them to have all relevant facts on that issue they needed to be informed of the breach involving the June 4 editorial. I thought the jury would be confused if not told a breach had been found when the editorial was discussed during the trial. The danger of prejudice to Gannett and The New Mexican was outweighed by these considerations.

## PAROL EVIDENCE

■ On the first day of presentation of testimony, March 26, 1980, I allowed parol evidence about pre-merger negotiations on the theory that it was admissible on the fraud claim, and because the oral pre-contract negotiations did not contradict the terms of the written agreement. On that day, McKinney testified extensively about what had been said in pre-contract negotiations, over objection by Gannett and The New Mexican. I did give a limiting instruction based on the above rationale. Upon reconsideration of New Mexico case law on parol evidence, I decided that the theory on admissibility of parol evidence needed to be refined and cleared up for the jury.

The specie of fraud upon which parol evidence is admissible is that Gannett entered into the merger intending not to perform the promises contained in the written documents, specifically the Employment Agreement. This type of fraud is recognized as actionable in New Mexico. *Telman v. Galles*, 41 N.M. 56, 63 P.2d 1049 (1936); *Anderson v. Reed*, 20 N.M. 202, 148 P. 502 (1915).

■ Previously, McKinney had argued that another specie of fraud, namely fraud in the inducement, could be made out. But the promises alleged by McKinney as inducement for McKinney to enter into the merger are the very promises contained in the Employment Agreement. Thus, extrinsic or parol evidence is not admissible to prove these promises, either because the oral promises would contradict the written promises, or because the oral promises relate to the subject of the written documents. *Bell v. Lammon*, 51 N.M. 113, 179 P.2d 757 (1947); *Alford v. Rowell*, 44 N.M. 392, 103 P.2d 119 (1940).

A motion was made on March 27, 1980, in chambers by counsel for Gannett to limit the fraud claim to the Employment Agreement and Gannett's alleged intent not to carry out the promises contained in it. This motion was resisted at the time by counsel for McKinney because I had not yet made a ruling on the separability of the merger documents. McKinney sought rescission of the entire merger, not just of the Employment Agreement, and so needed to assert that Gannett fraudulently induced McKinney to enter into the merger by making promises about his continuing employment at The New Mexican. I ruled that fraud in the inducement would not be dismissed, but that the parol evidence rule might preclude McKinney from proving that type of fraud, because all the alleged misrepresentations in Para. 2 of the Amended Complaint were merged in the Employment Agreement, and because Gannett did not sign the Employment Agreement. As things eventually turned out, I ruled the Employment Agreement, Plaintiff's Exhibit 505, and the Agreement and Plan of Reorganization, Plaintiff's Exhibit 501, were inseparable, so that the specie of fraud on which parol evidence could be heard was the only one which survived.

■ The issue of the separability of the two documents, the Employment Agreement and the Agreement and Plan of Reorganization, Plaintiff's Exhibits 505 and 501, was the other issue on which I allowed parol evidence. As mentioned above, Gannett was not a party to the Employment Agreement. Rather, the Employment Agreement was between The New Mexican on the one hand and McKinney on the other. But the entering into the Employment Agreement was a condition to the Agreement and Plan of Reorganization, Article VI(h), Plaintiff's Exhibit 501 at 36. Also, a letter from Gannett's counsel, Douglas H. McCorkindale, states that the Board of Directors of Gannett had duly approved the transactions. I concluded that the issue of the separability of the two agreements, such that breach of the Employment Agreement or fraud by Gannett with respect to the Employment Agree-

ment would constitute breach of the entire merger or fraud with respect to the entire merger, was not dealt with unambiguously on the face of the documents. For this reason, the separability of the two documents was a factual issue. In order for the factfinder to ascertain the intent of the parties as to this issue, parol evidence of pre-contract negotiations was admitted. *See, Franklin v. American Nat. Ins. Co.*, 135 F.2d 531, 534 (10th Cir.1943) (not error to admit parol evidence in explanation of contract separability).

During the trial I gave a limiting jury instruction on the purposes for which parol evidence could be considered. This instruction was given numerous times, whenever requested by any party, or when objections were made by Gannett and The New Mexican to the admission of the parol evidence.

BREACHES OF CONTRACT AND FRAUD

■ I noted previously that the jury, also, failed to find the specie of fraud submitted to it for its advisory verdict. The jury's advisory action on the fraud issue as well as on the five claimed breaches of contract upon which the jury returned advisory verdicts is congruent with my findings and conclusions. But having said this, the following, also, needs to be said: the failure of the jury to find fraud or the failure of the evidence to convince me that this specie of fraud existed means only that McKinney's evidence failed to prove that Gannett entered into the Employment Agreement with the intent, *at the time of execution*, not to honor its terms. Notwithstanding this, the evidence is strikingly clear and convincing that after, but not too long after, the execution of the Employment Agreement, the first of a long series of actions which became the starting point of Gannett's trail of broken promises was wilfully, deliberately and wrongfully taken by Gannett.

My observation of the Gannett men who appeared and testified in court, consideration of their testimony and the exhibits admitted into evidence, and reflection on the testimony of others regarding the conduct which molded the breaches of the Em-

ployment Agreement tell me that these are hard-charging, wilful men who, almost without exception, were fully cognizant of the dimensions of Gannett's obligations and McKinney's rights under the Employment Agreement. But this awareness notwithstanding, some of them, acting together, struck for themselves and the corporation they represented a deliberate course of conduct which wilfully and wrongfully dishonored Gannett's obligations and, bit by bit and day by day, shamelessly destroyed the rights bargained to McKinney.

Evidence admitted at trial clearly establishes that Gannett, for whatever reasons, desired to sever the relationship between McKinney and The New Mexican. It is my conclusion that Gannett attempted to accomplish this by deliberately and repeatedly breaking the promises made to McKinney as contractual undertakings in the Employment Agreement.

The Employment Agreement, Plaintiff's Exhibit 505, went into effect on February 27, 1976, when the merger was closed. The provisions of the Employment Agreement that were breached are contained in paragraphs 3A and 3B:

A. Subject to such overall corporate and departmental budget limitations as may be established by the Board of Directors, as Chief Executive Officer and Publisher, the Employee shall be in complete charge of the business and operations of the Company, and shall be responsible to the Board of Directors. He shall be responsible for the news and editorial policies of all publications subject to his direction and shall direct, supervise and oversee all operations of such publications, with complete authority over all employees. The employees of the Company shall be responsible to the Employee, and any policies established by the Board of Directors of the Company pertaining to employees shall be implemented through the Employee....

B. Subject only to such news and editorial department budget limitations as may be established by the Publisher of such publications and the Board of Directors, as Editor-in-Chief, the Employee

shall be in complete charge of news and editorial policies of all publications presently published by the Company. He shall direct, supervise and oversee all news and editorial operations of such publications with complete authority over all news and editorial employees, subject only to such news and editorial department budgeting limitations as may be established by the Board of Directors of the Company and the Publisher of such publications. . . .

The quoted provisions of the Employment Agreement are, in my opinion, clear and unambiguous. They give McKinney, as Editor-in-Chief for 10 years, total control of news and editorial policies of The New Mexican, subject only to budget limitations not here relevant. They give McKinney, as Chief Executive Officer and Publisher for 5 years, complete control of the business and operations of The New Mexican, Inc., subject only to "corporate and departmental budget limitations" not here relevant, except that as Chief Executive Officer and Publisher McKinney was to be "responsible to the Board of Directors."

In both capacities, McKinney had the duty, under Paragraph 3C, to "use his best endeavors to promote the interests of" The New Mexican, although he had complete discretion to decide how much time and effort he would devote to the performance of his duties under the contract, and to decide in what place or places and to what extent he would perform them.

In the year 1976, McKinney had essentially no complaints about how the relationship between him and Gannett was working out. In retrospect, however, some incidents gain importance because of their relationship to later events. One such incident was the hiring of Steve Pope as circulation manager at The New Mexican on August 16, 1976. He was hired by The New Mexican's general manager, Steve Watkins, on the strength of strong recommendations by Gannett and of Pope's interview with Watkins. Pope was later discharged in the midst of an accounting scandal which is discussed below.

Another incident gaining importance through later events was the filing of a unionization petition by newsroom employees with the International Typographical Union (ITU) on August 24, 1976. This set in motion a series of events culminating in the firing of Steve Watkins as general manager in March 1978 and a subsequent newsroom vote to decertify the union.

In December 1976, a Gannett meeting was held in San Francisco. At that meeting the pending Speidel merger was announced. Speidel Co. was a relatively small, financially troubled newspaper chain which Gannett had agreed to buy. Many top executives from Speidel were to be kept on at Gannett. Gannett began a regionalization plan in which newspapers within the Gannett group in geographical proximity were grouped together. As a result of this regionalization, The New Mexican was to be a member of Gannett West. At the San Francisco meeting, Steve Watkins was introduced to two Speidel executives, Rollan Melton and Robert Whittington. These two would head Gannett West after the Speidel merger. Melton and Whittington were later used by Gannett to build a file against Watkins to justify his termination and to actually fire him.

Gannett was very concerned about the impending unionization of the newsroom at The New Mexican. Gannett labor lawyers were in charge of strategy and negotiations. Part of the strategy was that Watkins would "wear the black hat" and take a very hard line against the union. He accepted this role and, partly because of it, there developed a strong animosity between Watkins and pro-union newsroom employees. On the Gannett corporate jet returning east from the San Francisco meeting, Allen Neuharth, president of Gannett, expressed to Watkins the seriousness of newsroom unionization at The New Mexican and told him that he was to do whatever was necessary to combat the union, even if it meant "stepping over the line." Watkins understood this to mean that, if necessary, even illegal steps were to be taken. During the pre-unionization strategy and union negotiations, Watkins cooperated ful-

ly with Gannett labor lawyers and was in agreement with their policies.

In the year 1977, winds of change began blowing at The New Mexican, and signs of problems became more pronounced. On January 12, 1977, the newsroom election went against the company. McKinney and Watkins traveled to Washington to meet with Neuharth and John Quinn, Gannett's Senior Vice President of News and Information. It was decided a new managing editor would be needed in the newsroom, and Barclay Jameson was named by Gannett. McKinney and Watkins interviewed Jameson. The Employment Agreement was discussed and Jameson assured McKinney he would recognize McKinney's authority under the contract. Jameson was hired with McKinney's consent.

Gannett and McKinney had different theories about why the newsroom voted for the union. Gannett thought wages under McKinney had been too low for many years and employee discontent just happened to come to a head in January 1977. McKinney thought wages at The New Mexican had been fair, taking into consideration other wages and salaries in the community of Santa Fe. His thinking was that the employees sensed that the merger forecast higher profits to be reaped by the corporate giant and that the employees desired to share in these by way of higher compensation for their services.

Jameson was Watkins' counterpoint in the union negotiation strategy: he wore the "white hat." His assigned role was that of the nice guy to the newsroom employees. He took sides with personnel in the newsroom and supported them in their demands against the company. He did not participate in the formal negotiations. Gannett's policy in the negotiations was to avoid a first contract with the union. It did not matter how favorable that contract may have been to the company. In the meantime, wages were frozen in the newsroom and pro-union employees were replaced with ones who would support the company over the union. Animosity towards Watkins grew. Affection for Jameson increased. The union lost ground.

Jameson's loyalties were to Gannett rather than to McKinney. He developed a strong dislike for Watkins and began to have difficulties working under him. His response was to go to John Quinn of Gannett with his complaints. He did not communicate his problems with Watkins to McKinney at all, nor did Gannett relay that information to McKinney. Memos were introduced at trial which showed that Jameson surreptitiously was providing prejudicial information about Watkins to Gannett officials at every opportunity. One memo circulated at Gannett West describes Jameson as Quinn's "spy on the scene," i.e. Jameson was Gannett's agent at The New Mexican.

In the fall of 1977 Jameson reported to Gannett that Watkins was quite shaken when he saw the Speidel profit margins. The issue of profit margins is a central one in this case. Under McKinney's ownership, The New Mexican showed a moderate annual profit. After acquisition by Gannett there was a push to boost profits. McKinney and Watkins were in agreement with Gannett that profits should increase. Gannett provided services to its subsidiaries to streamline expenses. Profit plans (a positive way to say budgets) were developed annually for each subsidiary. Periodic reviews were made to evaluate achievement. Each subsidiary was ranked in comparison with the others.

When the Speidel merger occurred the newspapers in that chain were added to the comparisons. The former Speidel newspapers showed profits of up to 50%, among the highest in the Gannett group. This worried Watkins. Not only was The New Mexican now being compared with Speidel newspapers, but the former Speidel executives were now the heads of Gannett West, of which The New Mexican became a part. As things progressed, Watkins feared he was being pushed to increase his profit margins too quickly. A precipitous rise in profits, he felt, would damage the quality of the newspaper and lead to its eventual demise.

Watkins became defensive towards the profit push. This convinced Gannett offi-

cials that he was standing in the way of progress. Indeed, at a meeting in Visalia, California in late October 1977, Watkins openly resisted higher Gannett profit plans for The New Mexican. He expressed to Gannett officials that the readers and advertisers would not accept more price increases. His feeling was based on over 10 years' experience as general manager of The New Mexican and a much longer association with the Santa Fe market.

Watkins' resistance at the Visalia meeting probably sealed his fate at Gannett. Larry Miller, Gannett's controller, found Watkins "dense, defensive, boorish" at the Visalia meeting. He suggested Gannett fire him. Neuharth blurted out to Melton that "Watkins' future is that he will be fired." Neuharth also expressed to Melton that Gannett could not accomplish what needed to be done at Santa Fe "with McKinney and Watkins in the way." In fact, Neuharth, the top executive at Gannett, testified that he had decided, by as early as late 1976 or early 1977, that Watkins had to be gotten rid of. The events which followed the Visalia meeting carried out the intent of Gannett to get rid of Watkins. Some of those events constituted clear and deliberate breaches of the Employment Agreement.

The first clear breach of the Employment Agreement occurred when Gannett fired Watkins on March 28, 1978. Watkins insisted on honoring McKinney's contract. He contacted McKinney when major changes were proposed in the business and operations of The New Mexican. One of the items in Gannett's "file" against Watkins was that he acted as though he were responsible to McKinney rather than to Gannett. This, of course, was proper conduct on the part of Watkins. But it was frustrating to Gannett and Watkins thus was viewed as an impediment. The contract provides, in Paragraph 3A: "The employees of the Company shall be responsible to the Employee (McKinney)...." Clearly, it is the Employment Agreement itself which was getting in the way. Gannett hoped to get rid of the man who insisted on honoring that contract. It thereby would rid itself of obnoxious obligations under the contract.

Another matter which rankled Gannett corporate headquarters about Watkins and McKinney were events surrounding the reacquisition of The Taos News by McKinney. Taos had been included in the 1976 merger in order to make it a tax-free transaction for McKinney. McKinney wanted to retain ownership of Taos to give to his daughter, Robin McKinney, then 21 years old. Because of legal restrictions, no reacquisition could be made for two years from the date of the merger, and no written option could be given. Gannett gave McKinney an oral option to repurchase Taos. The option was exercisable for six months commencing two years after closing. The New Mexican provided services for The Taos News: typesetting, printing, mailing, advertising layout, etc. A few months before the Taos option matured, Gannett decided to start charging Taos for those services, and to apply the charges retroactively. Watkins did not oppose a reasonable charge for the services rendered by The New Mexican, but the charges proposed by Gannett were far in excess of what The Taos News need pay for such services elsewhere. He resisted what he perceived as exhorbitant charges, and brought the matter to McKinney's attention. McKinney instructed him not to oppose the charges, no matter how out of line, because his oral option was probably legally unenforceable and he did not want to cause Gannett to renege on that promise. Watkins withdrew his resistance. But he had generated more animosity from Gannett.

By contract, McKinney had complete authority over all employees. Gannett speculated that by building a file against Watkins it could justify firing him and keep McKinney from insisting on his right to keep Watkins. The only attempt to apprise McKinney of problems with Watkins was on December 14, 1977. By then, the "file" on Watkins was ready and Gannett had begun looking for a proper successor. The type of person desired by Gannett was someone who, contractual obligations notwithstanding, would acknowledge Gannett

as the "master" at The New Mexican. His qualifications must include an ability and willingness to ignore the plainly and precisely defined rights of McKinney and not permit these to stand in the way of orders coming down from Gannett. Watkins' replacement should be someone who, in dealing with McKinney:

1) would be nice to the "old coot";

2) would tell him what had been done *after* it had been done; and

3) would keep his office dusted in case he dropped in.[1]

On December 14, simultaneous meetings were held in Chicago and New York. In Chicago, Watkins was read a laundry list of complaints about his performance by Melton and Whittington. Top on the list was that Watkins acted like he was working for McKinney, not Gannett.

Another complaint was that Watkins was not making enough progress in the profit margin area. The New Mexican was compared with two other Gannett newspapers, Bellingham and Olympia, which had margins of 36–38%. Watkins was told he didn't have much future at Gannett unless he could raise his profits to similar levels. Watkins realized at that point he was a "gonner" because he knew it would destroy the newspaper to push it so hard so fast. Under Watkins' managerial control, paid circulation figures had risen steadily over the years. He felt that squeezing so much profit out of the newspaper so quickly would produce long-term detriment. Loss of quality would lead eventually to drops in circulation, drops in advertising, and strengthening of competition. Of course, under the contract, the Board of Directors of The New Mexican could impose budget limitations on McKinney's operation of the newspaper. Thus, the Board

could have forced Watkins to implement a profit plan in which the margin was 50%. McKinney had agreed that the Board would be controlled by Gannett, and Gannett had agreed to elect McKinney Chairman of the Board. But a board meeting was not called to discuss profits. Instead, Gannett unilaterally fired Watkins.

At the same time as Melton and Whittington were reading their laundry list of complaints to Watkins in Chicago, right down to the hour and minute, Paul Miller, the Gannett board chairman and top executive in charge of new acquisitions who had been the principal negotiator for Gannett in the acquisition of The New Mexican, was meeting in New York with McKinney. Miller did not tell McKinney that Watkins' main problem was that he didn't know for whom he was working. Instead, he mentioned four minor points, such as untidiness of certain rooms at The New Mexican and Watkins' not getting around the plant enough. There was discussion of the necessity of Watkins working within the Gannett operating framework. The meeting in New York was "polite" and nothing in its tone or substance notified McKinney that his general manager's head was on the chopping block. No mention was made of profit margins.

The use of simultaneous meetings by Gannett was the method adopted to handle the Watkins affair. Thus, when Gannett fired Watkins on March 28, 1978, the same method was attempted, except that McKinney was not able to be reached at the precise time of the execution. The final decision to fire Watkins was made by the Gannett operating committee on March 21, 1978, at a meeting in Tucson. It was consciously decided to keep information re-

---

**1.** Plaintiff's Exhibit 114. Webster says a "coot" is "a person, often old and harmless and sometimes not bright"; colloquially, a stupid fellow, a simpleton. Any of these are most inapt descriptions of McKinney.

Further, in this Exhibit Whittington of Gannett, speaking to the inability of Watkins to recognize the "master," pithely and with incisive perception summarized the substance of the McKinney-Gannett bargain in the first years after it came into being:

His (Watkins') primary problem is that he does not yet understand who he's working for.

It may be difficult to handle that basic problem. I believe it stems from the terms of the sale, which on paper seem to say "*I, McKinney, have sold the paper to Gannett, but I really still run it and they just got whatever money comes through.*" . . .

What it all means is that the poor devil doesn't really know who the hell his master is. . . . (emphasis mine)

garding this decision from McKinney until Watkins was about to be fired. A meeting of the Board of Directors of The New Mexican was not called to discuss the matter.

Eliminating Watkins was seen by Gannett as necessary not only as a first step in severing the McKinney relationship with The New Mexican. It also dovetailed nicely with the purpose of ridding the newsroom of the union. Over a year had passed since the newsroom had voted for the union. That meant that a decertification election could now be held. Watkins had played his black hat, hardliner role well and had incurred the wrath of the pro-union newsroom employees. Jameson was well established as the good guy, and had developed a genuine dislike for Watkins. He not only gave secret reports to Gannett headquarters about Watkins' shortcomings, but he also fomented dislike for Watkins at home, in the newsroom. It was theorized correctly by Gannett that ridding The New Mexican of Watkins would also accelerate riddance of the terrible annoyance in the newsroom, the union. This would come by way of a decertification election. Enough pro-union employees had quit or been fired; Gannett had stalled the wage-frozen union long enough; getting rid of the newsroom's nemesis would provide the final straw to break the union once and for all. Gannett refused to give the

union anything in contract negotiations, but it now had the opportunity to placate pro-union employees by handing them Watkins' head on a platter. It worked. Shortly after Watkins was fired, the newsroom petitioned for a decertification election. The vote was to decertify.

And so Gannett did not consult McKinney about firing Watkins. It knew it didn't have a strong enough case against him to get McKinney's approval. Even attempts to pin the Pope circulation fraud scandal [2] on Watkins would not be enough to justify the firing. McKinney would resist. He would insist on his rights under the contract. Gannett might be stuck with its deal, with McKinney, and with the newsroom union and a charge of unfair labor practices for bargaining in bad faith ("surface bargaining") to boot. Too much was at stake, and so Gannett broke the Employment Agreement and fired Watkins.

McKinney had complete authority over all employees. Even if Gannett were justified for legitimate budget reasons [3] in firing Watkins (which I find it was not), McKinney's contract was broken by the manner in which the firing was carried out. The Board was controlled by Gannett, but McKinney was Chairman and had the right to be present at all meetings. No meeting was called. The decision to get rid of Watkins was made unilaterally by Gannett

---

2. In August 1976 Steve Pope was hired by Watkins and McKinney as circulation manager. He came highly recommended by Gannett. At the time of Pope's arrival most of the circulation accounting was still done in the circulation department, although it was in the slow process of being shifted to the accounting department. It was later discovered that someone in the circulation department had been manipulating the "aging" of accounts receivable to avoid write-offs of old receivables. Some crucial records were missing and presumed destroyed. Steve Pope proposed a plan to defraud subscribers who had paid in advance. An audit by the Audit Bureau of Circulation resulted in disallowance of some of The New Mexican's reported circulation. Pope left The New Mexican in the Spring of 1978, after having admitted manipulation of accounts receivable.

3. McKinney's authority as Chief Executive Officer and Publisher was "subject to such overall corporate and departmental budget limitations

as may be established by the Board of Directors ..." I have concluded this phrase is unambiguous and that the only limitations on McKinney's authority are budget limitations, both corporate and departmental. Even if this phase is ambiguous, parol evidence admitted for other purposes establishes that my interpretation is correct. Each department of The New Mexican has a budget, and there is also an overall corporate budget. Not only that, but an earlier draft of the Employment Agreement shows that this phrase originally read "subject to such overall corporate budget limitations ...". The words "and departmental" were added during the negotiations by McKinney's lawyer, Kendyl Monroe. Gannett now urges an incorrect interpretation which would make McKinney's authority subject to "overall corporate limitations" as well as departmental budget limitations. Even under such an interpretation, McKinney's contract was broken because Gannett never acted to establish any type of limitations whatever through The New Mexican's board of directors.

without even informal consultation with McKinney. Certainly, McKinney's contract gave him more than just the right to be informed of the termination of his right-hand man after the fact.

The second breach of McKinney's contract occurred around the same time as Watkins' firing. This related to the selection and hiring of N. Walter Ryals as Watkins' replacement. Gannett would not take the chance of allowing McKinney even a minute to name Watkins' replacement even if he concurred that Watkins must go. That would defeat Gannett's purpose of implanting a general manager from outside McKinney's sphere of influence who would listen only to Gannett, and take his orders only from Gannett. Ryals was chosen because he was already a "company man" who understood that his orders came from Gannett and that McKinney was to be treated merely as a figurehead. He met all qualifications previously enumerated by Whittington (see pp. 19–20).

Although Ryals and other Gannett men who testified at the trial denied it, I find on the bases of Plaintiff's Exhibit 221[4] and the events which followed Ryals' installation that Ryals conducted a Gannett-inspired campaign to sever the McKinney relationship with The New Mexican. A deliberate plan was launched to get McKinney's name off the masthead of *The New Mexican*. The masthead carried McKinney in the capacity bargained to him by Gannett. Ryals' subsequent actions were consistent with such a campaign. The only uneasiness felt at Gannett corporate headquarters seemed to be caused by the alacrity with which Ryals had launched the campaign.

If McKinney could not have successfully blocked Watkins' firing, his "complete authority over all employees" certainly gave him the right to hire Watkins' replacement. Gannett preferred to ignore that right in order to accomplish its purposes. Gannett breached the Employment Agreement in so doing.

■ I further find that McKinney did not waive his contractual rights with respect to these two breaches, i.e. the Watkins termination and the hiring of Ryals. True, he came to Santa Fe and treated Ryals as the new general manager. He discussed his Employment Agreement with Ryals and received assurances from Ryals that he understood and would honor the contract. He even held a luncheon to introduce Ryals and Jameson to the business community of Santa Fe. But because of the way Gannett had acted, McKinney was left without a choice. The announcement had already been made public about Watkins being fired and replaced by Ryals. The coup d'etat was complete. McKinney's attempt at a counter-coup could have thrown The New Mexican into disastrous turmoil. McKinney testified that he tried to make the best of an unsatisfactory situation. He did what he thought was in the best interests of The New Mexican. He maintained composure and attempted to normalize the disruption. He sought to present a united front. But as between himself and Gannett, there was no acquiescence. McKinney refused to sign a consent form ratifying the actions previously taken by Gannett. He refused because those actions were taken without his prior knowledge or approval and, he felt, in contravention of the Employment Agreement. Gannett did not see fit to hold a board meeting of The New Mexican to ratify the actions until after this lawsuit was filed some five months later.

---

**4.** The alleged conflict of interest cited in Plaintiff's Exhibit 221 as the reason for attempted severance of the McKinney relation with The New Mexican was a sham and a pretense. Firstly, the interaction of McKinney with The New Mexican and with *The Taos News* was such that the "conflict," if any, could be relegated to the *de minimus* file. But whatever the magnitude, it was a "conflict" which Gannett fully accepted at inception. Gannett entered into the transaction with full knowledge that even McKinney himself might turn out to be the owner of *The Taos News*. The oral option to repurchase *The Taos News* was given by Gannett to McKinney or his daughter. In the clearest fashion, this waived any future claim of "conflict." It was clearly contemplated that McKinney could, and might, occupy positions at both The New Mexican and *The Taos News*. If a "conflict" existed it was a "conflict" bargained into the transaction.

The next breach of contract was the publication of the June 4, 1978, editorial. As discussed elsewhere, I decided this breach on summary judgment. Following the decision to buck McKinney's authority, McKinney was so informed by Robert Storey, the editorial page editor. McKinney then had a conversation with Ryals in which McKinney requested a memo from Ryals explaining how he proposed to operate The New Mexican. Ryals told him at that time that he thought The New Mexican should operate "the same as any other Gannett newspaper." A memo was then prepared, not by Ryals, but by Storey, and carefully redrafted by Gannett upper eschelon executives in Rochester. At trial, Plaintiff attempted to submit this memo to the fact finder as a separate breach, an anticipatory repudiation. The gist of the memo, Plaintiff's Exhibit 228 (copy attached), is that McKinney's complete editorial authority under the contract would be replaced by an editorial board of which McKinney would be one member. In other words, Ryals, with concurrence from the top, did not intend to honor a clear and important provision of McKinney's contract, one which, at that time, would otherwise be in effect for about seven and one-half more years. I did not consider this a separate breach under the doctrine of anticipatory repudiation. However, this document made the overall situation clear to McKinney and to the Court. The enormity of the third breach was revealed. And it suggested things to come, things which were intolerable to McKinney, things for which there was only one reaction: get rid of those at The New Mexican who had no intention of honoring his contract. At trial, Ryals testified as to his interpretation of McKinney's contract in relation to the restated bylaws of The New Mexican (Plaintiff's Exhibit 560). He said he thought McKinney could only dictate editorial policy if he were physically present in Santa Fe. The bylaws say that in the "absence" of the Chairman of the Board, the President "shall be vested with all the powers and perform all the duties of the Chairman of the Board." Article IV, Section 3, Plaintiff's Exhibit 560 at 5.

■■■ I find Ryals' interpretation strained, unreasonable and unacceptable. The offices of President and Vice President were held by Stephen Watkins. Although Watkins was fired as general manager in March 1978, he was not removed as an officer or director until at least August 31, 1978, see, Plaintiff's Exhibit 284. Thus, the bylaws in effect at the time of this breach in July 1978 gave no power to Ryals as he was not a director of The New Mexican at that time. Furthermore, even if Ryals were authorized by the bylaws to act in McKinney's absence, I would interpret the term "absence" much more broadly to mean unavailable or unreachable by any reasonable means. This is so because the bylaws of The New Mexican and the Employment Agreement must be read together and, if possible, given meanings which are consistent with each other. Section 3C of the Employment Agreement, Plaintiff's Exhibit 505, gives McKinney complete discretion to decide in what "place or places" he will exercise his rights and duties under that contract. Certainly his physical presence within the city limits of Santa Fe is not required.

McKinney had been in contact with his attorney ever since the Watkins-Ryals affair. Shortly before the editorial incident, Gannett was assuring McKinney through his attorney that it would like him to participate more rather than less in the management of The New Mexican. These assurances were made despite the termination of McKinney's right-hand man. Internal memos written at the same time these assurances were being given show that top Gannett officials really felt that the sooner they got McKinney's name off the masthead the better. These Gannett officials included Neuharth, President and Chief Executive Officer of Gannett. Plaintiff's Exhibit 221.

What went wrong? Maybe a contract such as the Employment Agreement, which is the subject of this case, is practically unworkable between parties such as those we have here. Parol evidence of prior contract negotiations (admitted on certain issues discussed elsewhere in this Opinion)

make clear that Gannett was reluctant to give McKinney a contract. It was against Gannett policy to give employment contracts to former owners of newly acquired newspapers. Gannett drafts of the contract attempted to strip McKinney's authority and leave him with titles. McKinney would not stand for this. He got, in Gannett's own words, "an airtight contract" in relation to his position as publisher and editor. I believe that Gannett went into this deal with its eyes wide open. It knew the Employment Agreement would interfere with how it wanted to run The New Mexican. It also knew that McKinney was old and physically infirm. It knew that he would be residing in Virginia. It wanted The New Mexican very badly. Gannett took a gamble. It gambled on McKinney's health continuing to worsen. It gambled on McKinney not meaning what, during negotiations, he had informed Gannett he must retain, i.e. real authority. McKinney's health improved dramatically at lower altitudes. McKinney, instead of fading away, insisted on exercise of his prerogatives under the contract. Gannett had lost its gamble and it must now act to set McKinney adrift, albeit in violation of the terms of their bargain.

In the face of all the developments thus far, McKinney, after mature and careful deliberation as well as further consultation with his attorney, decided to direct Ryals to fire Barclay Jameson. He did this in writing, Plaintiff's Exhibit 233. He was, in my opinion, exercising his contractual "complete authority over all employees." McKinney was justified in firing Jameson because of his refusal to carry out McKinney's orders on the June 4 editorial. Jameson had not been "responsible to" McKinney. McKinney named an acting managing editor from the ranks of The New Mexican employees. Ryals refused to carry out this direct order. Ryals consulted with Gannett and then told McKinney he would not fire Jameson. Another breach.

McKinney then fired Ryals. Plaintiff's Exhibit 237. He named an acting general manager and directed Ryals to publish a news release in the next Sunday *The New Mexican* announcing the action. Gannett refused to carry out any of McKinney's orders. Another breach.

McKinney filed this lawsuit. Gannett responded by duly calling a meeting of The New Mexican's board. McKinney declined to attend, a previous informal attempt at reconciliation having failed. At that meeting, a resolution was passed that the purported terminations of Jameson and Ryals by McKinney were void and of no effect. At that meeting, the final and ultimate breach of McKinney's Employment Agreement occurred: McKinney's responsibilities (authority) under his contract were suspended pending this litigation. He was left with empty titles and his perquisites. Gannett argued that it was necessary to remove McKinney's authority after he had filed this lawsuit because it would have been destructive to the newspaper to allow McKinney to continue his authority while in an adversarial position with it. This argument assumes it was wrongful for McKinney to sue to enforce his rights under the contract. I do not agree. This lawsuit was a perfectly legitimate way for McKinney to vindicate his rights. Gannett could have responded by fully honoring McKinney's contract. Instead, it escalated its pattern of breaches to the highest level of dishonor.

■ With respect to these last three breaches (refusal to fire Jameson and Ryals, removal of McKinney's authority), I determined that a question of fact existed as to an affirmative defense raised by Gannett, whether McKinney by his actions had failed to use his "best endeavors to promote the interests" of The New Mexican as required in his Employment Agreement. Plaintiff's Exhibit 505, Para. 3(C) at p. 4. I submitted this defense to the jury for their determination. Independently I decided this affirmative defense had not been proved. When McKinney attempted to exercise his complete authority over all employees by firing Jameson and Ryals, he did so after mature deliberation with due concern for the interests of the newspaper. He protected those interests by naming acting replacements until permanent replacements could be found for the vacant

positions. Thus, Gannett had no legal excuse for not carrying out McKinney's orders to fire Jameson and Ryals. Nor did Gannett have any legal justification for removing McKinney's authority after he filed this lawsuit.

As for the remaining claims in McKinney's complaint, all were dismissed prior to or after the close of all the testimony. The seventh cause of action for inducing breach of contract had been dismissed against The New Mexican by Order of March 18, 1980. The eleventh cause of action for breach of duty of good faith was dismissed against both The New Mexican and Gannett because it failed to state a claim. I determined that the claimed obligation of good faith did not give rise to an affirmative claim for breach of duty.

The third cause of action for fraud and deceit was kept in and as discussed elsewhere was decided in favor of Gannett. All the other causes of action alleging variations of fraud were dismissed because the evidence simply did not support them or because they were redundant. These include the second, fourth and fifth causes of action for federal securities fraud, constructive fraud, and negligent misrepresentation, respectively.

The sixth cause of action, meeting of the minds, was dismissed as not supported by the evidence. It seemed clear that there had been a meeting of the minds, but that the resulting bargain had been dishonored by Gannett.

The seventh and ninth causes of action for inducing breach of contract and conspiracy were also dismissed. My decision that the corporate existence of The New Mexican was to be disregarded eliminated the necessity of retaining these alternative theories of relief. The eighth cause of action for interference with prospective advantage was dismissed as it really did not apply to the situation brought out at trial. Finally, the tenth cause of action for unjust enrichment was dismissed. If any unjust enrichment has occurred as a result of Gannett's breaches, that will be taken care of by the remedy ordered in this case.

The only affirmative defenses that were considered with respect to the breaches were waiver and failure to use best endeavors. I thought that waiver could only apply to the first two breaches, the firing of Watkins and the hiring of Ryals. Failure to use best endeavors applied only to the last three breaches, as discussed above. Neither affirmative defense was proven. None of the affirmative defenses alleged by Gannett or The New Mexican applied to the breach involving the gubernatorial endorsement editorial decided on summary judgment, or to the fraud claim. Because of the volume of affirmative defenses raised in the Answers, they will not be discussed separately. I dismissed them because they were either legally or factually insufficient.

■■■ One such affirmative defense deserves mention if only because so much discussion was had about it at the trial. Gannett claims that under the interpretation of the Employment Agreement urged by McKinney and accepted by the Court, the Employment Agreement is void and unenforceable. This point has been amply briefed by the parties. I conclude that under my interpretation of the Employment Agreement, the contract is valid and enforceable under the laws of New Mexico. A board of directors may resolve to delegate its management authority to an officer by contract. Section 53–11–48, N.M.S.A.1978. This was accomplished by the Employment Agreement. When the merger was closed in February 1976, The New Mexican's board of directors passed a resolution authorizing the corporation to enter into the Employment Agreement with McKinney, and also restating the by-laws to track the language of the Employment Agreement.

■■■ With respect to the last breach, the removal of McKinney's authority, a board meeting was held at which it was decided to take that action. McKinney concedes the board is authorized by statute to remove any officer when that is in the best interests of the corporation. Section 53–11–49, N.M.S.A.1978. However, the statute provides that the contractual rights of

the persons removed are not prejudiced. *Id.* Thus, McKinney may maintain this action and gain his remedy based on that breach.

▮▮▮▮ Watkins' removal is another matter. That breach was committed by Gannett without the benefit of a board meeting. Thus, the statute giving the board the bare power of removal does not come into play because the board did not act to remove Watkins. Gannett argues that the subsequent ratification of Watkins' removal brings the action within the statute and cures the breach. I disagree. First of all, I believe that subsequent ratification of this action taken in breach of the Employment Agreement cannot cure the breach. Second, I believe there would have been an actionable breach here even if the board had taken this action after a duly called meeting. Although the literal terms of the statute apply only indirectly, the underlying policy giving precedence to contract rights implies that McKinney can maintain his contract rights even though it was Watkins who was removed.

The New Mexican's counterclaim was dismissed. Broadly construed, it sought damages based on causes of action sounding in negligence, breach of contract and breach of fiduciary duty. But The New Mexican produced no evidence of damages and thus could not recover on the counterclaim. Further, the allegations in the counterclaim resemble the affirmative defenses asserted in The New Mexican's Answer. I determined that if any of the issues in the counterclaim should be submitted, they should be considered as affirmative defenses. Thus, the allegations in the counterclaim that McKinney tried to fire Ryals and Jameson contrary to the best interests of The New Mexican were incorporated into the affirmative defense I considered with respect to the last three breaches as discussed above. Those allegations in the counterclaim which were not incorporated into an affirmative defense did not have sufficient support in the evidence or were legally insufficient to support a claim. Fi-

nally, The New Mexican simply failed in its proof of any of the allegations in its counterclaim which might have entitled it to relief of any kind.

## IS THERE ONE ENTIRE CONTRACT OR SEPARATE CONTRACTS?

▮▮▮ In order for McKinney to achieve rescission of the entire agreement between him and Gannett, he must first show that the Employment Agreement, Plaintiff's Exhibit 505, and the Agreement and Plan of Reorganization, Plaintiff's Exhibit 501, are parts of an inseparable contract such that breach of the Employment Agreement constitutes breach of the entire agreement.[5] The test of separability is whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever if any promise or set of promises were struck out. *Bass v. Occidental Life Ins. Co.,* 19 N.M. 193, 142 P. 798 (1914); *Fancher v. Board of Commissioners of Grant County,* 28 N.M. 179, 210 P.2d 237 (1922); *United States v. Bethlehem Steel Corp.,* 315 U.S. 289, 62 S.Ct. 581, 86 L.Ed. 855 (1942); *Franklin v. American Nat. Ins. Co.,* 135 F.2d 531 (10th Cir.1943); 6 Williston, Contracts (3d ed.) Section 863. Put another way, "(w)hether a transaction imports a single contract or several contracts depends not on the number of promises or the number of things promised, but on whether there has been a single expression of mutual assent to all the promises as a unit or whether the parties expressed their assent separately to the various promises." 6 Williston, Contracts (3d ed.) Section 859 at 251.

▮▮▮ The issue of entire contract versus separate contracts must not be confused with the issue of divisibility of a contract. A divisible contract is always an entire contract. 6 Williston, Contracts (3d ed.) Section 861 at 263–266. Divisibility refers only to performance of parts of the contract. If a contract is divisible, then performance of one part of the contract by one party gives rise to a duty of the other party to perform a corresponding portion of that contract. Here the issue is not whether

---

**5.** This does not end the inquiry, for even a breach of the entire agreement must be material

and substantial to warrant rescission of the entire agreement.

part performance by one party has implicated the necessity of part performance by the other party. Thus, divisibility is not at issue.

 In determining whether McKinney and Gannett assented to the Employment Agreement and the Agreement and Plan of Reorganization as parts of a single whole, I must look first to the written documents themselves. The issue is one of intent. In many cases, construction of the document or documents will yield an indication of the intention of the parties on this issue. Where this is the case, the issue is one of law for the court to be determined by examination of the documents. *Walters v. U.S. Fidelity & Guaranty Co.*, 35 N.M. 4, 288 P. 1044 (1930); *Fancher, supra.*

The Employment Agreement and the Agreement and Plan of Reorganization are contained in separate documents. However, the documents refer to each other. Plaintiff's Exhibit 501, the Agreement and Plan of Reorganization, states that McKinney's obligations under it are conditioned on The New Mexican and McKinney having entered into the Employment Agreement, Article VI(h) at pp. 31, 36. Also, Gannett's obligations are conditional upon receipt of a legal opinion that the Employment Agreement is valid, Article VII(c)(iii) at pp. 36, 39–40. Again, Gannett agrees to elect McKinney as chairman of the board of directors of The New Mexican pursuant to the Employment Agreement, Article VIII(g) at p. 48. The Employment Agreement is alluded to generally by Gannett's representation that its board of directors has duly "approved the transactions contemplated by this Agreement ...," Article III(g) at pp. 19, 22. It is undeniable that the Employment Agreement is one of the transactions contemplated by the Agreement and Plan of Reorganization. *See, also,* Article IV(a)(v) at pp. 23, 24, 25 (The New Mexican promises not to enter into any contract of employment except as contemplated by Agreement and Plan of Reorganization).

Similarly, the Employment Agreement refers back to the Agreement and Plan of Reorganization so that the two documents mesh. Plaintiff's Exhibit 505, Section 1 at p. 1. However, the parties to the Employment Agreement are McKinney and The New Mexican, whereas the parties to the Agreement and Plan of Reorganization are different—McKinney, The New Mexican, and El Nuevo Mexicano, Inc. on the one hand and Gannett on the other. Also, the Agreement and Plan of Reorganization says "(t)his Agreement constitutes the entire Agreement between the parties...." Article IX(g) at p. 52.

I cannot be sure of the intention of the parties just by looking at the documents. In such a case it is proper, even necessary, to look to all the surrounding circumstances. *Fancher, supra; Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972); *John v. United Advertising, Inc.*, 165 Colo. 193, 439 P.2d 53 (1968). One circumstance is the time when the documents were signed. Here all documents, including the Employment Agreement and the Agreement and Plan of Reorganization, were finalized at the closing, on February 27, 1976. The subject matter of the documents is another factor. Here, the subject matter of the Employment Agreement is quite different from that of the Agreement and Plan of Reorganization, although they are related in that employment of McKinney is at The New Mexican, and the change of ownership relates to The New Mexican. A peculiarity relating to the subject matter of these two documents suggests their inseparability: essentially, what McKinney did was transfer ownership of his newspaper to Gannett while retaining control of it for himself for a period of years. The Employment Agreement itself does more than promise employment and compensation for McKinney. It reserves for him, for a period of five years, nearly complete editorial and business control of the newspaper. For another five years after that, McKinney retains only editorial control. While it is possible that such an Employment Agreement might have been entered into by these parties as a separate contract, my instinct is that such a contract would not have been agreed to by Gannett if it stood alone. It seems much more likely that Gannett

would have made these promises only as part of an overall package, one which includes as a necessary part Gannett's acquisition of the same newspaper over which McKinney retained so much control.

In order to resolve the question of whether the transactions are but parts of an entire contract, I thought it necessary to admit parol evidence. The question is an important one and, although I was inclined to find the documents inseparable after considering the above factors, I allowed parol evidence to clear up any uncertainties. Where an ambiguity exists in interpreting a contract, parol evidence may be used to clear up that ambiguity as long as the parol does not either contradict the contract terms or relate directly to the subject of the written contract. *Bell v. Lammon*, 51 N.M. 113, 179 P.2d 757 (1947); *Alford v. Rowell*, 44 N.M. 392, 103 P.2d 119 (1940). Here, parol is not used to contradict the contract terms, nor does it relate to the subject of the contract. Rather, parol evidence of prior contract negotiations is used to elucidate the intent of the parties as it relates to the separateness or entirety of the two documents in question. Parol evidence may be used for this purpose. *Sierra Blanca Sales Co., Inc. v. Newco Industries, Inc.*, 84 N.M. 524, 505 P.2d 867 (Ct.App.1972), *cert. denied* 84 N.M. 512, 505 P.2d 855 (1972); *Franklin v. American Nat. Ins. Co., supra; Bethea v. Investors Loan Corp.*, 197 A.2d 448 (D.C. App.1964); *Brown v. Bd. of Ed. of Morgan City School Dist.*, 560 P.2d 1129 (Utah 1977); *United States v. Bethlehem Steel Corp., supra.*

All the parol evidence of prior contract negotiations points to the wholeness of the contract between Gannett and McKinney. At one point in the negotiations, McKinney became upset at what he perceived as Gannett's constant efforts to strip him of any real power under the Employment Agreement. Agreement had already been reached on the financial terms of the merger, yet McKinney directed his attorney to stop work on the entire merger unless and until an Employment Agreement satisfactory to McKinney was worked out. Clearly from McKinney's point of view, the Employment Agreement was a *sine qua non* for the merger. He would not have sold The New Mexican to Gannett without the promises contained in the Employment Agreement. Gannett was certainly acutely aware of this. McCorkindale urged McKinney's attorney to continue work on the larger contracts even though McKinney had directed him to stop because of problems with the Employment Agreement.

There were numerous drafts of the Employment Agreement during the negotiations phase. More than once Gannett submitted a draft in which Gannett attempted to undermine the control it knew McKinney expected. Invariably, McKinney directed that the document reflect the bargain he demanded—business control for five years, editorial control for ten years. Admittedly, Gannett would have preferred no Employment Agreement, or an Employment Agreement without teeth. Gannett was opposed to giving an employment contract as it was against Gannett policy to giving any kind of employment contract. From Gannett's point of view, it would never have given McKinney an Employment Agreement like this one unless it had to in order to get McKinney to sell The New Mexican.

My conclusion, after examining the documents, looking into the circumstances surrounding the transactions, and considering the events leading up to the closing, is that the Employment Agreement and the Agreement and Plan of Reorganization are parts of one contract. Gannett agreed to do certain things and McKinney agreed to do others. All these agreements were essential to the overall deal; there would have been no bargain at all if either the Employment Agreement or the Agreement and Plan of Reorganization had been struck out. There was a single expression of mutual assent to all the promises contained in these and the other "closing documents," Plaintiff's Exhibits 501–601.[6]

---

6. Later, in the accounting phase of the trial, Gannett again attempted to sever part of the contract from the rest of it. Gannett wanted to exclude the Taos News acquisition from the rest

The New Mexico Court of Appeals had before it a case involving an employment contract and sale of a business. *Clem v. Bowman Lumber Co.*, 83 N.M. 659, 495 P.2d 1106 (Ct.App.1972). Clem sought rescission of the sale based on an alleged breach of the employment contract. He claimed he had been wrongfully terminated from his employment and that the two agreements were inseparable. The court did not reach the issue of entireness of the agreements because it found the employment contract was not breached, that Clem's termination was not wrongful. The court did, though, recognize that the two agreements could be viewed as one entire contract:

> Plaintiff contends the finding, and the conclusion based thereon, is erroneous because the contract was for "... the purchase and sale of a ... plumbing contracting business ...," and the agreement to hire plaintiff was a part of the purchase and sale.

> The contract could properly be construed as plaintiff contends. The contention, however, is not material.

*Id.*, 83 N.M. at 660, 495 P.2d 1106.

The court goes on to discuss that the agreement for the purchase and sale of the business contains an agreement to hire Clem. Clem was hired, pursuant to the contract. Only Clem's discharge from that employment was in issue, not the purchase and sale provisions. The court failed to deal with the fact that it was also agreed in the purchase and sale that Clem would be retained for ten years. But the employment agreement was not breached, thus, the entireness of the agreements was immaterial. Even if the employment agreement had been breached, and the agreements constituted but one entire contract, Clem would have had to prove the breach went to the essence of the contract in order to justify rescission.

Gannett places reliance on a case from its home state of New York, *Rudman v. Cowles Communications, Inc., supra.*

There, Rudman sought damages for breach of his employment contract and rescission for fraud in connection with the separate sale of his test book publishing company to defendant. At trial, Rudman was awarded money damages for wrongful discharge from employment, and denied rescission because of a lack of proof of fraud. The trial court also concluded that the two contracts were separate and independent, so that rescission of the sale could not be accomplished through breach of the employment agreement. The final appellate court affirmed the trial court in all respects. That case is distinguishable. There is no indication that the two contracts referred to each other, only that they were "separate" documents. They were executed on different days, not on a single closing date. Also, the subject matter or content of the employment contract is quite different from McKinney's. Rudman's contract called for him to perform executive and administrative services, but contained nothing about his authority. In fact, Rudman's contract reads much like one of the Gannett drafts—that Rudman will perform those services which would reasonably be assigned to him by the board of directors. Such an employment contract could conceivably be separate from the purchase and sale contract. The purchasing company might want the man who had developed numerous test books to continue editing them in order to help out the company, if and when the company needed his help. That does not appear to be the case with McKinney and Gannett. Rather, McKinney thought it necessary to spell out his authority very carefully in order to retain control of employees and of the editorial policy of The New Mexican. Further, even if the contracts in *Rudman* had been mutually dependent and inseparable, the court thought rescission was not an appropriate remedy as assimilation of Rudman's small business into the large company was complete and because damages were adequate to compensate Rudman for his wrongful discharge.

of the agreement for purposes of the accounting. Again, I ruled that Taos was an inextricable part of one deal, and that it would be included in the accounting because the entire deal must be rescinded.

A more recent case decided by a federal court in New York found two documents to be inseparable. Citing *Rudman* for the general rule that the intent of the parties as manifested at the time of contracting is to be gleaned from all the surrounding circumstances, the court in *Dynamics Corp. of America v. Intern. Harvester Co.*, 429 F.Supp. 341 (S.D.N.Y.1977) concluded that the two documents in question were parts of a single, entire contract. There, as here, one party's obligations under one document were "expressly conditioned" upon the other party's *executing* the other document. Although the documents dealt with different subject matter, the court reasoned that the two documents were contemporary and implemented a single coordinated transaction. Because neither document would have been agreed to without the other, they were inseparable.

Gannett places reliance on *Arrow Gas Co. of Dell City, Texas v. Lewis*, 71 N.M. 232, 377 P.2d 655 (1962) as the leading New Mexico case on the issue of separate contracts versus one entire contract. That reliance is misplaced. *Arrow* is about divisibility of a single contract. The issue there was whether A and B were entitled to partial performance by the other parties to a contract, where A and B had performed part of the contract. Thus, the tests announced in *Arrow* relate to divisibility of an entire contract and are not the same as must be applied in the case before me. *Cf.* 6 Williston, Contracts (3d ed.) Sections 860–862 (divisible contract).

▇ Finally, Gannett argues that all the transactions contemplated by the Agreement and Plan of Reorganization cannot form a single contract, that because they are on separate documents they are separate contracts. It points out that breach of any one of the myriad transactions among the closing documents, Plaintiff's Exhibits 501–601, could not give rise to rescission of the entire merger. This argument misses the point. As discussed elsewhere in this opinion, rescission will only be granted by a court of equity where a breach is material, substantial. The breach must go to the essence of the agreement. Thus, a breach of one of the many other transactions involved in the merger indeed may not give rise to rescission. That does not mean the transactions are separable and distinct from each other.

After hearing all the testimony, I concluded that reasonable minds could not differ on this point and that the documents were parts of one entire contract. I informed the jury of this decision by means of an instruction during my charge to the jury. (Instruction No. 11)

DISREGARD OF CORPORATE ENTITY OF THE NEW MEXICAN

▇ One of McKinney's theories for holding Gannett responsible for the breaches of his Employment Agreement even though Gannett was not formally a party to the Employment Agreement is that The New Mexican was the *alter ego* of Gannett such that the corporate existence of The New Mexican should be disregarded. Thus, any remedy would run against Gannett because it was really Gannett that broke its promises to McKinney. I find this theory fits the facts of the case.

This analysis begins with the basic proposition that a corporate entity should be recognized and supported. The corporate form serves certain functions, not the least of which is to shield its shareholders from liability for the corporation's acts and omissions. *See, Anderson v. Abbott*, 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793 (1944) (incorporation for purpose of limited liability is valid). However, the corporate entity will be disregarded in a judicial proceeding when the corporation is used to promote injustice, or where to recognize the corporation would result in inequity. *Shillinglaw v. Owen Shillinglaw Fuel Co.*, 70 N.M. 65, 370 P.2d 502 (1962); *State Trust & Savings Bank v. Hermosa Land & Cattle Co.*, 30 N.M. 566, 240 P. 469 (1925); *Scott Graphics, Inc. v. Mahaney*, 89 N.M. 208, 549 P.2d 623 (Ct.App.1976), *cert. denied* 89 N.M. 322, 551 P.2d 1369 (1976).

I made the factual determination that The New Mexican was the *alter ego* of Gannett after listening to all the evidence, and communicated this to the jury by means of an instruction, Instruction No. 14.

I thought that this was a factual issue about which reasonable minds could not differ, and that it related to the equities of the case. *Cf. State Trust & Savings Bank, supra* (court of equity not bound to recognize corporate entity). Gannett, the sole shareholder of The New Mexican, has so manipulated The New Mexican that the identity of The New Mexican has merged into that of Gannett.

The Employment Agreement, Plaintiff's Exhibit 505, was signed by Stephen E. Watkins for The New Mexican and by Robert M. McKinney. It was entered into as of February 27, 1976, the closing date for the entire merger. Even without parol evidence one would have to surmise that the agreement was negotiated between McKinney on the one hand and Gannett on the other. The promises contained in the Employment Agreement were in reality extracted from Gannett, not from The New Mexican. What McKinney bargained for with Gannett and what is embodied in the Employment Agreement as well as in the other corporate documents is a separate subsidiary corporation. What McKinney got, it turned out, was a corporation whose separateness disappeared into the parent.

Some of the factors I considered in making this determination are mentioned. Gannett had complete stock ownership of The New Mexican, and controlled The New Mexican's Board of Directors with a majority. McKinney, it had been agreed, would be the President of The New Mexican and Chairman of its Board of Directors, but in many important respects Gannett bypassed the Board and ignored McKinney's and The New Mexican's procedural rights. For example, when Gannett decided to get rid of Watkins and install Ryals as The New Mexican's new general manager, Gannett did not call a meeting of the Board to discuss the matter. McKinney's corporate protections were ignored along with his contractual rights. When Barclay Jameson, the newsroom's managing editor, developed problems in his working relationship with Watkins, his complaints went to Gannett, and Gannett did not respect The New Mexican's corporate identity by bringing that trouble to the attention of McKinney, The

New Mexican's President, Chairman of the Board, Publisher and Chief Executive Officer. The interlocking directorate acted as though there were no difference between Gannett and The New Mexican. Allen Neuharth gave orders to The New Mexican as if he had been delegated a great deal of power by the Board of The New Mexican, although that delegation theory was wholly imaginary.

Examples of Gannett disregarding the corporate separateness of The New Mexican are numerous. Douglas McCorkindale, Gannett's general counsel, explained that the only reason all Gannett's subsidiaries have not been merged into the parent is for state tax purposes. In all other respects, then, Gannett itself treats its subsidiaries as having no separate corporate existence. Gannett did not think it necessary to have its new personnel policy, Defendants' Exhibit NM–A–5, adopted formally by The New Mexican's Board of Directors in order to be effective at The New Mexican, despite the fact that such policy conflicts with The New Mexican's contract with McKinney giving McKinney complete authority over all employees. McCorkindale further explained that all Gannett subsidiaries had meetings of their boards only when necessary for a legal requirement involving a third party. Beyond that, Gannett treated each of its subsidiaries, including The New Mexican, as a division of the whole, a mere appendage, an adjunct of Gannett.

Even though separate books are kept for The New Mexican, presumably for state tax purposes, Gannett had complete financial control of The New Mexican. All cash generated by The New Mexican was funnelled off to Gannett headquarters. As part of the centralized financial system, The New Mexican had to fill out capital appropriation forms in order to get money back for its capital purchases. The integration of The New Mexican's financial structure into Gannett's, although not complete, is striking.

Walter Ryals, The New Mexican's new general manager after Watkins' termination, was definitely a Gannett man. He was installed by Gannett for the purpose of

being responsive only to Gannett, not to McKinney. He always understood he took his orders from Gannett, not from McKinney. As he explained, he was appointed by Allen Neuharth, not by the Board of Directors of The New Mexican. He respected Gannett corporate policy and followed it unquestionably despite conflict with The New Mexican's contractual obligations and irrespective of whether The New Mexican's board had adopted it. When a dispute arose involving McKinney's authority over editorial policy or over personnel matters, Ryals took his directions directly from any Gannett official who could be reached, and flaunted McKinney's authority. No thought was given by Ryals or the Gannett officials to calling a board meeting to resolve the dispute.

Gannett's own disrespect for the corporate separateness of The New Mexican in all respects except those which benefit Gannett justifies my disregarding the corporate separateness of The New Mexican for purposes of imposing liability and fashioning a remedy for wrongs done to this Plaintiff. It is my belief that an injustice would result if the corporate veil were not pierced. Gannett and The New Mexican acted as one in all the acts leading up to and constituting the six breaches except the suspension of McKinney himself (McKinney declined to attend *that* Board meeting, having just filed this lawsuit). These were not the separate acts of two separate corporations. Rather, Gannett manipulated and controlled the entire scenario and cannot now be heard to complain that McKinney seeks a remedy which goes to the realities of what happened: Gannett dishonored the Employment Agreement which was an integral and inseparable part of the entire merger. McKinney bargained for The New Mexican to be a separate corporation governed by a Board of Directors, not by Gannett. He bargained for that Board to delegate a great deal of its authority to himself for a period of years. That bargain was not fulfilled. Gannett's corporate shell game must end. Gannett itself must answer for Gannett's conduct *vis a vis* McKinney.

Because of my decision on the *alter ego* theory, it is unnecessary to consider McKinney's other theories of conspiracy and inducing breach of contract.

THE REMEDY

As mentioned elsewhere in this Opinion, McKinney waived his claim for legal damages and elected the remedy of rescission. Because the acts of The New Mexican are the acts of Gannett, and because the Employment Agreement is inseparable from the Agreement and Plan of Reorganization, McKinney is entitled to rescind the entire merger even though he has not proven his fraud claim if the breaches are substantial and go to the essence of the bargain contemplated by the parties. *Samples v. Robinson,* 58 N.M. 701, 275 P.2d 185 (1954); *Rudd Paint & Varnish Co. v. White,* 403 F.2d 289 (10th Cir.1968) (N.M.); 12 Williston, Contracts (3d ed.) Section 1455.

The nature of the bargain between the parties, as I view it, was a mutual transfer of assets in which McKinney, for a period of years, retained certain controls of the asset with which he was parting. The New Mexican was but a small gem to be added to the mounds of sparkling jewels in Gannett's brimming chest of treasure. But this small gem could not be purchased outright. McKinney would not relinquish his complete ownership and enjoyment of the possession which he had nurtured for so many years. He would phase out relinquishment of his total bundle of rights in this property over a period of years. That which he retained, with certain limitations not significant to results in this case, were "complete charge of the business and operations of the Company" and "complete authority over all employees" for five (5) years and "complete charge of news and editorial policies of ... publications" for a period of ten (10) years. These were central and important functional rights and privileges in his prior total ownership of The New Mexican. These would furnish him sustenance and enjoyment in the later epochs of an eventful and exciting life.

McKinney was to be boss. "Complete charge" and "complete authority" are sim-

ple concepts which present no great difficulty in comprehension. McKinney was to occupy the dominant role in one specific area for five (5) years and in another for ten (10) years. Gannett contracted to assume and abide deference and subservience to McKinney in these areas for these periods. And it made not one whit of difference that Gannett owned each and every share of the common stock of The New Mexican. This was part of the price Gannett contracted to pay to acquire The New Mexican. In return for Gannett stock, McKinney transferred to Gannett his ownership of The New Mexican and carved out for himself a reserved interest of control and management for a period of years. Gannett breached the bargain by a course of conduct in which it was made clear to McKinney that his reserved right to control and manage the newspaper would no longer be honored. The breaches committed by Gannett go to the essence of the bargain. The breaches relate to rights of McKinney which are so substantial and fundamental that without them, from McKinney's perspective, basic objects for making the bargain are completely frustrated. The breaches occurred relatively early in the term of the contract. They were wilful and deliberate. Despite the lack of sufficient proof on McKinney's fraud claim, the conduct of Gannett was far from unintentional. It acted without regard for McKinney's rights, not to mention his sensibilities.

Gannett argues that one who breaches a contract is not ordinarily considered a wrongdoer. As a general proposition this may be correct. But this is not the ordinary case. Gannett's breaches were wrongful. Rather than a few isolated incidents amounting to merely technical breaches of the Employment Agreement, Gannett's course of conduct, evidenced by the actions of the highest level Gannett executives, created an ignoble showdown. McKinney's authority was superceded without legal justification. McKinney was stripped of rights which had been bargained in good faith. There is no market where McKinney can replace what Gannett has wrongfully taken from him. Considering McKinney's age, his health and all other circumstances, Gannett has already wrought, and daily continues, an unconscionable and malicious deprivation of precious rights belonging to McKinney. For example, the right to control the editorial policy of the only newspaper published in the capital city of the State of New Mexico in the years 1978, 1979 and 1980 is a right which dollars cannot measure. It was a unique right for which no commodity or other property can serve as a substitute. And as time passes the opportunity to McKinney to enjoy that which he bargained for, and was bargained unto him by Gannett, is lost to him forever.

The most succinct and appalling documentation of Gannett's intent to ignore McKinney's rights is contained in Plaintiff's Exhibit 228, the memo requested by McKinney of Ryals around the King-Skeen editorial dispute. That memo was prepared and approved by high Gannett people for signature by Ryals.

Gannett argues the breaches were technical because it had the right to accomplish everything it did through The New Mexican's board of directors. All McKinney suffered, it asserts, was the lack of a formal board meeting. I disagree. Even though McKinney's contract made him "responsible to the Board of Directors" with respect to the business and operations of the newspaper, he was only "subject to" budget limitations and required to use his "best endeavors to promote the interests" of The New Mexican. Gannett failed to establish at trial that McKinney had breached his duty to use his best endeavors, or that he had exceeded any budget limitations. Thus, the board could not have fired Watkins and hired Ryals over objection by McKinney. Even if the phrase "responsible to the Board of Directors" were construed as giving the Gannett-controlled board the ultimate right to control the business and operations of the newspaper, no such qualification of McKinney's right to control editorial policy is found in the Employment Agreement.

One of the greatest sources of wonder to me at trial was the attitude of some of the Gannett men when they addressed McKin-

ney's right of "complete charge" and "complete authority" under the Employment Agreement. It appeared incomprehensible to them that complete ownership by Gannett of all of the stock of The New Mexican could in any way be reconciled with "complete charge" and "complete authority" by McKinney. They attempted to project sincere impressions that these contractual provisions did not really mean what they clearly state. The effort failed. Neuharth, for example, cavalierly characterized McKinney's solid and substantial contract rights of "complete charge" and "complete authority" as "window dressing." He testified that all McKinney wanted with the Employment Agreement was "window dressing" to give the appearance of authority where none was really wanted. However, my conclusion after hearing all the testimony is that the "window dressing" theory is merely an after-the-lawsuit-was-filed fabrication by Gannett to counter the contention by McKinney that the breaches were substantial. Such an interpretation of McKinney's intentions is belied by McKinney's word on the witness stand and by his behavior after the closing date and before the breaches began to occur. He actually exercised his authority and took an active interest in the newspaper. Similarly, I reject as improbable Douglas McCorkindale's statement that McKinney vascillated a great deal and kept changing his mind about what he wanted in the Employment Agreement. I find McKinney to be a most decisive person with clear ideas about his course of action.

The substantiality of the breaches is highlighted by the realization that McKinney would not have entered into the bargain if he had contemplated that Gannett would not keep its word with respect to the promises contained in the Employment Agreement. He was attracted to Gannett because of its policy of "local autonomy." The signing of the Employment Agreement is an express condition to the Agreement and Plan of Reorganization. Gannett agreed to elect McKinney as chairman of the board to carry out the terms of the Employment Agreement. And McKinney's testimony made clear the importance to

him of getting Gannett's promises in writing before he would sell The New Mexican. Clearly there would have been no deal if McKinney had believed his Employment Agreement would not be honored. *See, Polyglycoat Corp. v. Holcomb,* 591 P.2d 449 (Utah 1979) (plaintiff would not have made contract if it knew of defendant's intent to breach); *Havas v. Alger,* 85 Nev. 627, 461 P.2d 857 (1969) (contract would not have been made if default had been expected).

Gannett argues that a contract for management services in conjunction with a sale of a business does not go to the essence of the bargain. It cites for this proposition *El Paso Natural Gas Co. v. Kysar Ins. Agcy., Inc.,* 93 N.M. 732, 605 P.2d 240 (Ct.App.1979). In that case, the trial court had denied rescission of a rental agreement based on failure of lessee to perform managerial services. The appellate court affirmed, stating that such failure did not go to the essence of the bargain between the parties. Of course, the determination of what breach goes to the essence of a bargain is a factual one which must be based on the peculiarities of each case. For example, another court found that where a seller of a business failed to stay on for two weeks with the buyer to acquaint him with the business as promised, there was a substantial breach going to the essence of the sale and entitling the buyer to rescission. *Davis v. Hastings,* 261 P.2d 193 (Okla.1953). The facts of the present case impel a finding that the breaches by Gannett were substantial breaches going to the essence of the bargain. The bargain would never have been consummated without the promises by Gannett which later were breached. Gannett's course of conduct evidences a complete repudiation of McKinney's authority coupled with an apparent intent by Gannett to disregard the Employment Agreement. Thus, rescission is a remedy available to McKinney.

■ Of course, a court of equity will not order an equitable remedy if the party has an adequate remedy at law. Thus, I must consider whether McKinney could be

compensated adequately by money damages. Perhaps if this were a different type of case I would conclude that all McKinney is entitled to is his salary and the money value of the other perquisites due him under the Employment Agreement for the unexpired term of his contract. But I cannot blind myself to the realities of the bargain here. Aside from the exchange of the stock in the merger, what happened was that McKinney parted with unique property (the newspaper, its trademark and tradename, its real property, etc.) in exchange for another unique asset, namely the right to control the business and editorial policy of the newspaper for a number of years. The uniqueness of such property and assets has been recognized by other courts. *Gannett Co. Inc. v. The Register Publishing Co.*, No. 74–123 (D.Conn. April 10, 1980); *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 441 F.Supp. 628, 644–645 (W.D.N.Y.1977), prelim. injunction vacated 601 F.2d 48 (2d Cir.1979); *Jones v. Williams*, 139 Mo. 1, 39 S.W. 486 (1897). Where unique property is involved, damages may provide an inadequate remedy and an equitable remedy may be called for. *Vanzandt v. Heilman*, 54 N.M. 97, 214 P.2d 864 (1950); *P.Daussa Corp. v. Sutton Cosmetics (P.R.) Inc.*, 462 F.2d 134 (2d Cir.1972); *Mundy v. Irwin*, 20 N.M. 43, 145 P. 1080 (1915).

The Court in *Jones v. Williams, supra,* grappled with the issue of adequacy of legal remedy in a case involving a breach threatened in the future. There, Joseph Pulitzer contracted away to Jones what McKinney here retained, the right to manage and control a newspaper. Pulitzer later attempted to force Jones, as editor, to change editorial policy on two issues of the day and Jones refused. Anticipating loss of his job, Jones sued for an injunction against the newspaper's corporate board to keep it from breaching his contract, and for specific performance of his five-year employment contract, including the exclusive right to decide editorial policy. The court recognized that Jones' employment contract gave him an opportunity to sustain and enlarge his reputation. "The management of a metropolitan newspaper also gives to the manager a power and influence among men which is estimated by some as beyond a money value.... The control of the paper was, moreover, a property right, in the nature of a lease, which he had the right to enjoy for five years.... It appears perfectly manifest that taking from plaintiff the right to manage and control the paper according to his own judgment could not be compensated in damages." 39 S.W. at 493–494. The court concluded that any further breach, if allowed to occur, would not be compensable in damages, and affirmed the lower court's grant of equitable relief. Similar considerations persuade me that McKinney's remedy at law would be inadequate.

■ Gannett next argues that McKinney has no remedy because his salary and perquisites have been provided pursuant to his contract even though his authority at The New Mexican has been severed. It asserts that in New Mexico an employment contract carries with it no right to be employed, relying on *Black v. Board of Ed. of Jemez Mountain School Dist. No. 53*, 87 N.M. 45, 529 P.2d 271 (1974). This is a case I decided at the trial court level. In that case a school superintendent was suspended in March although his contract was to expire in June. His salary was paid, however, until the end of the contract period. The case holds that for purposes of a statutorily mandated due process hearing, the superintendent's suspension with salary did not amount to a discharge. That case involves a question implicating due process rights and is not a guiding light for this breach of contract case. McKinney's contract gives him more than a right to receive a salary and benefits. It gives him power and influence in the spheres of issues reached by the medium of the newspaper over which he has retained control. McKinney's contract certainly comes within an exception to the rule that an employer does not, by a contract of employment, promise to provide an employee with an opportunity to work. *See,* Restatement, Agency 2d Section 433, Comment c (if anticipated benefit to employee from doing work is material part of advantage to be

received by him from employment, promise to furnish work is inferred). It cannot be gainsaid that an editor and publisher of a daily newspaper in the state's capitol city receives a material advantage in being allowed to carry out his duties. Thus, I conclude that Gannett promised in the Employment Agreement to furnish McKinney the opportunity to work. McKinney retained this opportunity for himself for a term of years. It was the opportunity to move, mold and affect events and people. Is this not usually why editorials are written? But McKinney retained this opportunity not for the purpose of filling the editorial page for the benefit of Gannett. The motive was gratification of McKinney. This is perfectly legal and appropriate. Gannett, when it purchases control of the editorial pages of newspapers it acquires does it, I assume, for about the same reason. Furthermore, this case is different from *Black* in that it is not merely the Employment Agreement which is involved. Due to its inseparability from the Agreement and Plan of Reorganization, the latter, as discussed elsewhere in this Opinion, is inseparably tied to the Employment Agreement.

 Gannett next argues that McKinney waived his right to seek rescission. This waiver theory is based on the fact that the first breach occurred on March 28, 1978 when Watkins was fired, yet McKinney didn't file this lawsuit until September 1, 1978. In the meantime, Gannett asserts that McKinney acted inconsistently with his claim for rescission by apparently accepting Ryals as the new general manager. Also, McKinney has continued to accept his salary even after this lawsuit was filed.

It is true that one can waive a right to rescission by delay or by inconsistent actions. *Yucca Mining & Petrol. Co. v. Howard C. Phillips Oil Co.*, 69 N.M. 281, 365 P.2d 925 (1961); *Justheim Petroleum Co. v. Hammond*, 227 F.2d 629 (10th Cir.1955). But McKinney's actions do not amount to a waiver. When Watkins was fired and Ryals installed, McKinney hosted a luncheon to introduce Ryals to the community in Santa Fe. This does not mean McKinney

acquiesced in the actions of Gannett; he simply had no other choice at the time. Ryals assured McKinney he would honor the Employment Agreement, so a lawsuit at that time may have been premature. The best course was to attempt to patch things over for the good of the newspaper. But as we know now, Ryals was under instructions to disregard McKinney's authority, to tell him about changes after they were made, in effect to humor him while pushing him out. McKinney stopped receiving information about The New Mexican as promptly and completely as had been received when Watkins was at The New Mexican. Under Ryals' managership, more breaches occurred. As McKinney began to discern a pattern developing, his reaction went from conciliation to confrontation, and Gannett responded ultimately by suspending McKinney's authority completely.

In *Fantl v. Joyce Pruitt Co.*, 34 N.M. 573, 286 P. 830 (1930) the plaintiff company had contracted for the services of a purchasing representative in New York (Fantl). After Fantl breached the contract several times over a period of months, the New Mexico company sent notice of early termination, and Fantl sued for the amount due for the remaining term of the contract. He argued that the breaches were trivial and partial and thus could not form the basis for rescission. The court held that although the specific breaches relied on were not major, the company nonetheless was entitled to rescind because the breaches evidenced "a continuous course of dealing, violative of the true spirit and purpose of the contract." 34 N.M. at 576, 286 P. 830. Fantl argued that the company had waived its right to rescind because it had continued to recognize the contract by making payment after the breaches occurred. The court rejected that argument, stating, "(i)t took time and recurrence of offenses to satisfy (the company) that the contract was being violated in its essentials. (It) may have waived the various irregularities as independent causes for rescission. We do not think (it) waived the right to prove them as a course of conduct." 34 N.M. at 578, 286 P. 830. By the same token,

McKinney has not waived his right to rescission for the accumulation of breaches by Gannett.

Nor do I believe that McKinney has acted inconsistently with his quest for rescission by continuing to accept his salary and benefits under the Employment Agreement. Acceptance of monies representing salary and benefits is perfectly compatible with his prayer for rescission. On rescission being effected, the accounting which follows will merely take recognition of the fact that he has received these benefits. They are, in effect, advances from funds generated by an asset which I am ruling he shall be permitted to retake. In rescission, not only will the capital asset be returned to McKinney, but he will also recapture the net cash flows generated by the asset. Thus, it makes no difference whether salary and benefits are received now or after rescission. Should McKinney decide not to rescind after the accounting he would have been entitled to receive these monies as salary and benefits under the Employment Agreement.

■ The question remains whether this bargain can be salvaged at all, whether there is some workable equitable remedy less drastic than rescission. Gannett suggests that some sort of specific performance order be entered directing Gannett to abide by the Employment Agreement from now on. While specific performance is not an appropriate remedy for a personal services contract because a court of equity will not order a person to perform services involuntarily, Gannett correctly points out that this contract calls for the personal services of McKinney only, not of Gannett. Specific performance was ordered in *Jones v. Williams, supra.* Nevertheless, I must decline to order such a remedy in this case. This is a long-term contract calling for a working relationship among people. Several breaches have already occurred. Gannett thought that McKinney's filing this lawsuit justified their removing his power. It declined voluntarily to honor the contract when relations had broken down. Gannett's conduct amounted to an invitation to McKinney to litigate the matter. Litiga-

tion has been protracted and has risen to levels of unusual contentiousness. An order of specific performance by this Court would subject the parties to long-term enforced close encounters of a kind to be shunned. Enforcement of such an order would require the Court to oversee those encounters with its contempt powers. Almost sixty (60) days of trial time have nearly exhausted the parties, their lawyers, and the Court as well. The prospect of future litigation in the form of contempt proceedings is abhorrent to this Court. There must be a clean break. What was accomplished in the *Jones v. Williams* case by an order of specific performance is the same as the result reached in this case by an order of rescission: the wronged party will be allowed to continue as editor and publisher of the newspaper. The different treatment is mandated by the different procedural posture of the two cases as well as by the different contractual positions of the plaintiffs.

So far as remedy is concerned, the case distills to this: the Employment Agreement contemplated a union; a symbiotic union, perhaps, but a union nonetheless. Gannett has clearly and unmistakenly demonstrated that it will not live within its bargain. It has deliberately and wrongfully destroyed the basis of contractual coexistence bargained by it. The union has been made intolerable. Gannett has acted to assure it will not work. No reasonable alternative to rescission exists. Equity requires that McKinney be afforded the option to rescind after an accounting. Rescission is fully justified under the law and the facts of this case. In ordering rescission I am not punishing Gannett. I am merely exercising the remedial power of a court of equity. Gannett may feel it suffers too much from this remedy. I feel rescission is the fairest remedy and the only adequate remedy. Because an accounting will accompany rescission, Gannett will be made whole financially. My main concern, though, is for the wronged plaintiff. Equity requires that McKinney be afforded the option to rescind after an accounting. Money would not make him whole; money in this bargain was not the overriding concern on his part.

An accounting in this case will be difficult. But because The New Mexican has kept separate books despite control of its financial structure by Gannett, The New Mexican has not been completely assimilated into the parent. *Cf. Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972) (rescission not appropriate where assimilation complete). Thus, an accounting will, I trust, be workable.

OPTION TO RESCIND

 Instead of ordering rescission outright prior to an accounting, I will order that McKinney may elect to have rescission after the accounting. Rescission cannot be had without a price. The magnitude of the price cannot be firmly established without decisions on each item to be considered in the accounting.

Also, McKinney has expressed concern as to what Gannett might do to *The New Mexican* between the time an order of rescission is entered and the actual rescission effected. This period of time could be substantial. In view of the treatment McKinney has received at the hands of Gannett, I cannot assure myself with certainty that there is no ground for McKinney's fears. Giving McKinney the option to rescind after the accounting should act as an effective mechanism for assuring that Gannett will act toward *The New Mexican* in a responsible way.

The date by which McKinney must exercise his option to rescind will be set at sixty (60) days after judgment becomes final. This will provide McKinney a reasonable time within which he can investigate and evaluate the worth of the asset he is retaking against the price he must pay to reclaim it.

After the accounting is completed it is contemplated by me that a judgment will be entered encompassing my rulings above together with orders and rulings on the accounting.

THE NEW MEXICAN

N. Walter Ryals

President and General Manager

June 12, 1978

Mr. Robert M. McKinney

Route 1, Box 64

Middleburg, Virginia 22117

Dear Mr. McKinney:

I am enclosing a copy of the editorial that we ran on Sunday, June 4, endorsing Bruce King and Joe Skeen as Governor in the New Mexican primary. We felt it absolutely necessary to point out to King, as well as to the voters of the state, that we did not believe he was addressing himself to major campaign issues. We certainly were not arguing with his past record. Hopefully, the suggestion will be heeded by King and he will talk about issues, as well as past performance, prior to the general election.

I hope you understand that we at The New Mexican do not intend to infringe upon your role as publisher and editor of this newspaper. However, we feel that editorial policy discussions must include all of us who are responsible for the daily management of The New Mexican and who work hard to stay close to the full range of community concerns. This can be done, we believe, through an editorial board, which is a general practice among many newspapers within and outside of Gannett. That board should consist of you as publisher and editor, the president and general manager, the managing editor and the editorial page editor, plus one or two other news staffers on occasions when special background on the topics to be discussed would be helpful.

This approach assures the proper mix of information and ideas, including the benefit of your expertise and recommendations, which we want and need, especially when you can sit with us during our discussions. Gannett goes to great lengths to tell the story that its newspapers are run by those who live and work full time in the communities. Surely that same principle must apply here. I am certain that through the editorial board approach, we can develop the communication and understanding between you and those of us dealing with the day-to-day decisions here to keep The New

Mexican the responsive and responsible local newspaper that you, we and Gannett wants it to be.

Cordially yours,
THE NEW MEXICAN, INC.
/s/ Walt
N. Walter Ryals
President & General Manager

### EMPLOYMENT AGREEMENT

THIS AGREEMENT, entered into as of this 27 day of February, 1976, between THE NEW MEXICAN, INC., a New Mexico corporation with its principal office in Santa Fe, New Mexico (hereinafter, with each of its subsidiaries and any corporation or other entity managed by it, referred to as "the Company"), and ROBERT M. MCKINNEY, a resident of Santa Fe, New Mexico (hereinafter referred to as "the Employee").

WITNESSETH:

WHEREAS, the Company desires to employ the Employee in the capacities, for the term, and upon the conditions hereinafter specified, and the Employee desires to accept said employment;

NOW, THEREFORE, the parties mutually agree as follows:

1. *Engagement of Employee.* The Company hereby employes the Employee as Chairman of the Company's Board of Directors (subject to his election to that position by the Board, as more specifically provided in Article VIII(g) of the Agreement and Plan of Reorganization dated December 18, 1975 between Gannett Co., Inc., the Employee and The New Mexican, Inc.), as Chief Executive Officer of the Company, and as Publisher of all publications presently published by the Company. In addition, the Company hereby employs the Employee as Editor-in-Chief of all publications presently published by the Company.

2. *Term of Employment.* The term of this Agreement shall be for a period of ten years from the effective date hereof. During the first five-year period, the Employee shall be employed in all of the capacities specified in Paragraph 1 above. During the second five-year period, the Employee shall be employed only in the capacity of Editor-in-Chief as specified in Paragraph 1 above, unless the Company and the·Employee mutually agree to continue his employment in the other capacities, in which case this Agreement shall continue with respect to such other capacities on a month-to-month basis and shall be terminable by either party on thirty days' written notice. After expiration of the full ten-year period, this Agreement shall continue with respect to such capacities as the Company and the Employee shall mutually agree upon, on a month-to-month basis, and shall be terminable by either party on thirty days' written notice. If during the term of this Agreement the Employee dies or becomes incapacitated, the Agreement shall terminate as of the date of his death or incapacity. For purposes of the preceding sentence, "incapacity" means inability to perform the duties specified in Paragraph 3 herein for a continuous period of three consecutive months and a medical probability that such inability will continue in the future as certified in writing by a licensed physician attending the Employee.

3. *Duties of Employee.*

A. Subject to such overall corporate and departmental budget limitations as may be established by the Board of Directors, as Chief Executive Officer and Publisher, the Employee shall be in complete charge of the business and operations of the Company, and shall be responsible to the Board of Directors. He shall be responsible for the news and editorial policies of all publications subject to his direction and shall direct, supervise and oversee all operations of such publications, with complete authority over all employees. The employees of the Company shall be responsible to the Employee, and any policies established by the Board of Directors of the Company pertaining to employees shall be implemented through the Employee. It is specifically understood that the Employee shall be entitled to employ his daughter, Robin McKinney, in such capacities and upon such conditions as he shall determine, provided that Robin McKinney (i) may be employed only in capacities

which are within the range of her capabilities and experience, and (ii) may not be paid compensation which would exceed the compensation paid by the Company to other individuals in comparable capacities.

B. Subject only to such news and editorial department budget limitations as may be established by the Publisher of such publications and the Board of Directors, as Editor-in-Chief, the Employee shall be in complete charge of news and editorial policies of all publications presently published by the Company. He shall direct, supervise and oversee all news and editorial operations of such publications with complete authority over all news and editorial employees, subject only to such news and editorial department budgeting limitations as may be established by the Board of Directors of the Company and the Publisher of such publications. It is specifically understood that he shall be entitled to employ his daughter, Robin McKinney, in such news and/or editorial capacities and upon such conditions as he shall determine, provided that Robin McKinney (i) may be employed only in capacities which are within the range of her capabilities and experience, and (ii) may not be paid compensation which would exceed the compensation paid by the Company to other individuals in comparable capacities.

C. In either or both of the foregoing capacities, the Employee shall use his best endeavors to promote the interests of the Company in printing, publishing and circulating the newspapers and other publications presently published by the Company. It is specifically understood, however, that the Employee shall not be required to devote all of his time, skill or energy to his employment hereunder, but in accordance with his customary past practice shall devote such time and effort to the performance of his duties, in such manner, in such place or places, and to such extent, as he may individually and solely determine.

4. COMPENSATION OF EMPLOYEE. As compensation for his services hereunder, the Company shall pay to the Employee an annual salary of $30,000, in monthly installments, or such greater amount as the Board of Directors of the Company may determine, for the full term of this Agreement. In the event of the Employee's death or incapacity as defined in Paragraph 2 above, the Employee's compensation as provided herein shall terminate.

5. OTHER BENEFITS TO EMPLOYEE. In addition to the salary provided for above, the Company shall pay the usual and reasonable business expenses incurred or authorized by the Employee in the performance of his duties hereunder. He shall also be entitled to participate in the usual and customary fringe benefits available to him prior to the date of this Agreement. In addition to the foregoing, the Employee shall be provided with facilities, services and perquisites similar to those available to him prior to the date of this Agreement, including (but not limited to) the following: his present office in the building presently owned by the Company, or a comparable office in any future building (in which office, as was the case prior to the date hereof, he shall be entitled, but not required, to place his own furniture), an automobile and secretaries.

6. NOTICES. Notices or other communications hereunder, or in connection with the Employee's employment, shall be sufficient if in writing and if delivered personally or mailed by registered or certified mail as follows: To the Company, at its office in Santa Fe, New Mexico; to the Employee, at his office in Santa Fe, New Mexico. Either party may give notice to the other of a change in the foregoing addresses to any location within the continental United States.

7. *Agreement Binding on Successors.* This Agreement shall be binding and inure to the benefit of the Employee, but shall not be subject to assignment by him. This Agreement has been duly authorized by the Board of Directors of the Company and shall be binding upon and inure to the benefit of the successors and assigns of the Company, including any corporation into which it shall merge or consolidate or to

which it shall sell substantially all of its assets.

8. *Applicable Law.* This Agreement shall be governed by the laws of the State of New Mexico.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

>THE NEW MEXICAN, INC.
>By _____
> President

(Seal)

ATTEST:

_____
Secretary

>/s/ Robert M. McKinney
>Robert M. McKinney

## SUPPLEMENTAL
## MEMORANDUM OPINION

Previously, on March 17, 1981, a Memorandum Opinion was filed herein which contained my findings and conclusions on the first phase of this bifurcated trial. For the reasons stated in that Opinion I ordered rescission of the merger between Robert M. McKinney ("McKinney") and Gannett Co., Inc. ("Gannett"). I later ordered Gannett to account for all amounts taken out of The New Mexican, Inc. ("The New Mexican"), and to deduct for all business expenses reasonably incurred in managing the property. Interest is due on part of the net amount. In connection with that order, I made several rulings on the need to include and the deductability of various items of expense, some of which will be discussed below.

DAMAGES ANCILLARY TO RESCISSION. The theoretical goal in this rescission is to return the parties to the positions they were in before the February 1976 merger. Thus McKinney and Gannett will return the property exchanged—shares of The New Mexican for shares of Gannett. In addition, the accounting for profits has been ordered to bring the parties, again theoretically, to the positions they would have been in if the merger had never occurred. In other words, rescission undoes what happened on February 27, 1976

whereas the accounting undoes what has happened between the time of the merger and final judgment.

McKinney also seeks damages ancillary to or in addition to rescission and the accounting. He claims that Gannett by its negligence and mismanagement has damaged The New Mexican, that the property he is getting back is depleted of assets, of a staff loyal to McKinney, and of its good name. As a tangible example of damage, McKinney points to a drop in circulation of *The New Mexican* at a time when the city of Santa Fe has experienced steady growth. Additionally, he points to an apparent strengthening of the competition as well as some indication that local display advertising has decreased.

■ I ruled that no recovery could be had for these ancillary damages. First of all, whatever mismanagement, if any, that may have taken place was neither deliberate nor intended to hurt The New Mexican or McKinney. Second, in this case there is a very real danger that allowance of damages in addition to the accounting would amount to a double recovery by McKinney. Third, ascertainment of the amount of the damages and proof of causation as to the damages would be too speculative and conjectural.

This is not a case of deliberate mismanagement designed intentionally to damage the newspaper's value. If anything, it is a case simply of different philosophies of management. There is no question but that Gannett pushed profits harder after the merger than McKinney had before. If McKinney had remained the owner of The New Mexican he may have handled matters quite differently. He may have made less profit and ended up with better circulation figures. But until the time this lawsuit was filed, Gannett undoubtedly treated The New Mexican as one of its own. I have seen no evidence to the contrary. Since the time of the lawsuit and continuing throughout the trial of this case, inevitably there has been a strain on the running of the newspaper, a vital and dynamic operation. But Gannett has acted throughout as though it genuinely wanted to keep The

New Mexican as one of its subsidiaries. Thus, no deliberate damage would have occurred during that time. As for the time since my order of rescission and until McKinney regains ownership of The New Mexican, I believe the uncertainties of an appeal coupled with the possibility that McKinney may opt not to rescind will combine to assure that Gannett will act toward The New Mexican in a responsible way.

Probably the most important reason to disallow ancillary damages is that McKinney should not be allowed a double recovery. McKinney's theory is that Gannett's push for higher profits has damaged The New Mexican because quality has suffered in favor of quantity. McKinney compares the state of The New Mexican to that of a squeezed orange. To stretch the metaphor a bit further, McKinney will by means of the accounting for profits receive the proceeds from sale of its juice.

McKinney points to case law in New Mexico to support his prayer for ancillary damages. In *Gottwald v. Weeks*, 41 N.M. 18, 63 P.2d 537 (1936), the court in *dicta* stated that a seller of land may rescind and get back the property, a fair rental value for use of the property, plus damages for waste or injury to the property. In that situation, if the purchaser had cut trees and removed the timber, he would have to pay damages for the decreased value of the land because of his waste. However, it would be allowing the seller a double recovery to make the purchaser account for his profits from the sale of that same timber *and* pay for the decrease in value of the land because of the removed timber. That is what McKinney here seeks—he wants the profits made by Gannett *and* damages for the alleged decreased value of the newspaper because of Gannett's style of management. Presumably, if McKinney's theory is correct, Gannett's thirst for higher profits has in itself damaged the newspaper by substituting profitability for quality. If so, McKinney may in truth be getting back a newspaper worth less than it might have been worth if the merger had never taken place. But because an accounting for profits accompanies rescission in this case, McKinney cannot also recover for damage to The New Mexican.

Another strong consideration in my decision not to allow ancillary damages is that proof of causation would necessarily be conjectural and speculative. In an ongoing operation like that of a daily newspaper, management skill is undeniably a major factor in how well the various jobs get done. But to isolate those management decisions which are tortious (negligently made or carried out) and determine their monetary effect on the present value of The New Mexican would be an impossible task. For that matter, the "value" of The New Mexican would be difficult to pinpoint. McKinney points to the alleged drop in circulation and strengthening of competition as indicia of decreased value of the newspaper. But to convert that into dollar figures would require consideration of all the other financial indicia such as advertising revenues, including local, out of town, and national. Further, all other causes would have to be ruled out even if a decreased value could be shown.

McKinney argues that the long-term damage to The New Mexican may be far greater than the short-term "profit acceleration." This points out another aspect of the difficulty of ascertaining the amount of damages. Ancillary damages would have to be figured at present value. A newspaper being an ongoing concern, long-term damage cannot be measured with any degree of accuracy.

As for the change in staff which McKinney may have to effect when he takes back his property, I do not think this item of damages is compensable. First of all, the amount of this item would be quite speculative. It is doubtful the entire staff will be replaced, and the cost of training a new staff is unknown. Further, McKinney has in his tender of proof on this item of damage presented only a list of names which constitutes McKinney's "management team" that have been replaced, and a list of the new Gannett team, and a chart showing an increase in employee turnover. There has been no attempt to estimate the amount of damages suffered or to be suf-

fered in the future. Simply stated, it would be most difficult to establish the amount of this item of damages. Causation would present another problem of proof. It may be that high employee turnover is a result of Gannett's alleged profit gouging. Thus, McKinney will be compensated in the accounting for this result also. Finally, I have not allowed Gannett to deduct from profits any amount directly attributable to Gannett's breaches, such as Watkins' termination pay. Thus the problem of double recovery would be present in this item of damages as well.

The other item of damages sought is for injury to the good name or reputation of The New Mexican. This I believe would again present a problem of being too intangible and speculative as to both amount and causation.

McKinney suggests that the Court adjust the profits and damages to reach an equitable result. According to him, I could give McKinney the "maximum reasonable margin of profit" of 24%. Gannett would get to keep profits in excess of that margin. Then McKinney would recover for the items of damages, if any. This solution does not appear reasonable to me. It introduces further conjecture and speculation into an already complex remedy. It would be impossible to adjust the accounting for profits to prevent a double recovery in any meaningful way.

It is thought that under all the circumstances equity can be served by undoing the contract and by the accounting.

■ PUNITIVE DAMAGES. I did not submit the issue of punitive damages to the jury. Punitive damages can be awarded for breach of contract if there is a showing of malice or of reckless or wanton disregard of McKinney's rights. *State Farm General Ins. Co. v. Clifton*, 86 N.M. 757, 527 P.2d 798 (1974). This element has surely been established in this case. Malice has been described as the intentional doing of a wrongful act without just cause or excuse. *Bank of New Mexico v. Rice*, 78 N.M. 170, 180, 429 P.2d 368 (1967). In other words, it must be shown not only that the defendant intended to do the act

but also that he knew it was wrong at the time it was done. *Id.* The evidence would have supported submission of the issue of punitive damages to the jury. The only reason I did not allow an award of punitive damages is that the rule in New Mexico limits such an award to cases in which actual damages have been proven. *Grandi v. LeSage*, 74 N.M. 799, 399 P.2d 285 (1965); *Christman v. Voyer*, 92 N.M. 772, 595 P.2d 410 (Ct.App.1979). McKinney waived his right to damages for the breaches of contract and elected rescission. He argues that he should be allowed punitive damages based on a recovery of nominal damages. In New Mexico in a proper case, punitive damages may be supported by an award of nominal damages. *Crawford v. Taylor*, 58 N.M. 340, 270 P.2d 978 (1954); *Hagerman Irrigation Co. v. McMurry*, 16 N.M. 172, 113 P. 823 (1911); *Robison v. Katz*, 94 N.M. 314, 610 P.2d 201 (Ct.App. 1980), *cert. denied*, 94 N.M. 675, 615 P.2d 992 (N.M.1980). *But see Christman v. Voyer, supra* (punitive damages not recoverable even though nominal damages awarded). In this case, however, no nominal damages were awarded for the breaches.

Further, I have ruled that McKinney may not recover damages ancillary to rescission. Thus, there are in this case no actual damages to support an award of punitive damages. Even if ancillary damages were recoverable, they would not support an award of punitive damages because the conduct of Gannett upon which ancillary damages would have been recovered is different from the conduct giving rise to punitive damages.

RIGHT TO TRIAL BY JURY.

*Phase 2.*

The parties continued to insist on their right to trial by jury during Phase Two of this litigation. A recess was taken after I ordered rescission and the accounting, and the jury was kept on tap to return for Phase Two. During the recess I made the above rulings disallowing ancillary and punitive damages. Thus, no issues of damages remained to be tried by a jury. Further, during the course of the proceedings,

all parties had agreed that the accounting itself would be so complex that a jury would be of no use for the actual accounting. Thus, even if a right to jury might have existed on the accounting items, such right was waived. Phase Two proceeded in such a way that a jury would have been useless: all contested issues were questions of law to be decided by the Court; the factual questions relating to dollar amounts for each item determined to be owing were worked out between the parties and their accountants.

The accounting was based on an equitable claim for rescission. No damages are recoverable on that claim and none were awarded. The parties waived any right to a jury that may have existed in the accounting itself. I conclude there was no right to a jury on any issue in Phase Two of this trial.

THE ACCOUNTING. McKinney was ordered to return all shares of Gannett stock he received in the merger and to account for all dividends received on that stock. Because McKinney has sold and given away some of the stock, he must buy it back on the open market and account for dividends as if he had continued to own all the shares. Gannett was ordered to account for all amounts taken out of The New Mexican. From that figure Gannett was told to deduct for business expenses reasonably incurred in managing the property. Through correspondence, telephone conferences, informal meetings and formal hearings, all contested items in the accounting were identified and ruled on. The parties agreed on some of the items, and they were able to stipulate to some of the figures themselves because disclosure was afforded to McKinney by Gannett. Rulings on all contested items were finalized in a letter from the Court to counsel on March 17, 1981.[1] That letter is incorporated herein by reference and attached to this Opinion. Some of the contested items are discussed below.

1. INCOME TAXES. The parties agreed the accounting should be on a pretax basis. Nevertheless, Gannett attempted to convince me that Gannett's taxes on behalf of The New Mexican, being a reasonable business expense, should be allowed as a deduction. I ruled that Gannett could not deduct from amounts to be returned to The New Mexican any taxes it paid on behalf of The New Mexican.

■ Later, Gannett argued that it should receive credit for these same taxes for the purpose of computing interest. I ruled that this is a proper credit for that purpose. In other words, Gannett will not pay interest on the amount of money it paid in income tax on behalf of The New Mexican. Interest will be paid by both sides on the money each received as a result of the merger transactions from the date of closing in 1976 until the closing date which may occur as the result of my rescission order. It did not seem an equitable result to have Gannett pay interest on money it took out of The New Mexican to pay income taxes due because of Gannett's ownership of The New Mexican.

■ I have ordered that McKinney must account to Gannett for dividends paid by Gannett on Gannett stock sold or gifted by McKinney to others. These have been designated as "imputed dividends." The theoretical underpinning of this order is the following:

A. McKinney on disposition by sale of his Gannett stock received capital which presumably was reinvested and presumably generated earnings upon reinvestment.

B. McKinney on disposition by gift of his Gannett stock received donor satisfaction. I evaluate the worth of donor satisfaction as being the stock plus the earnings it has generated during this period.

C. The other side of the coin A and B above: Gannett paid dividends to stockholders who became owners of Gannett stock sold or gifted by McKinney. But for

1. Thereafter, three issues remained for decision and rulings were made at a hearing on June 11, 1981.

the merger this money would have been available to Gannett for investment.

At a later time in the accounting process, when the parties were discussing the mechanics of the disengagement, Gannett suggested an order for the various transactions which may result in Gannett's being able to obtain a tax deduction for an amount equal to the pre-tax earnings it is now returning to The New Mexican. Thus, Gannett would first return The New Mexican to McKinney, and it would then restore to The New Mexican the pre-tax earnings it took out of The New Mexican. This means that The New Mexican may be liable for income taxes on that amount. This is an equitable method because McKinney will also have a deduction for the dividends he is returning to Gannett. Those returned dividends will not be taxable to Gannett since Gannett had already paid all taxes due on earnings which generated the dividends. My ruling on the issue of whether the accounting would be done on a pre- or post-tax basis extends only so far as a determination of the amounts to be returned by each side, not to ultimate tax liabilities. Thus, Gannett's suggestion as to the sequence of events at the closing will be accepted.

2. INCLUSION OF TAOS. The 1976 merger encompassed several transactions and there were multiple documents finalized at the February 27, 1976 closing of the deal. One of the transactions concerned transfer of ownership of the other newspaper publishing corporation owned by McKinney, Taos Publishing Corp. ("Taos"). It published *The Taos News*, a Taos, New Mexico weekly. The oral option to buy back Taos was exercised and McKinney's daughter now owns it.[2]

▪ Gannett argued that the Taos part of the deal should be disregarded for purposes of the accounting. It suggested that the number of shares of Gannett stock attributable to Taos could be kept by McKinney, and correspondingly that Gannett would not account for the money it received when the Taos option was exercised.

I rejected Gannett's suggestion because I think the entire deal should be subject to my order of rescission. Taos is another example of an integral and inseparable part of the merger and as such it must be accounted for. Despite the fact that the Taos Agreement and Plan of Reorganization was a separate document and that the consideration for Taos was separately stated, there would have been no deal if Taos had been struck out. Its inclusion was necessary to obtain a pooling of interest opinion for the purpose of keeping the merger a tax-free transaction. McKinney would not have sold Taos by itself because he wanted to give it to his daughter.

Further, the consideration for the Taos deal was an arbitrary number of shares of Gannett stock, 4,897 of the total of 300,000. That number was allocated to Taos not because it represented its true value, but because there had been a shortfall of some $180,000 in The New Mexican's "balance sheet test." The parties had already agreed on a price of 300,000 shares for The New Mexican alone less a certain number of shares depending on the size of any shortfall; when the shortfall occurred, they simply agreed to a wash—Taos was included and the shortfall was wiped out. Because of this, it would be difficult at this time to go back and assign a fair value to Taos. This dilemma again points out the inseparability of Taos from the entire deal.

Taos can be accounted for without my ordering Gannett to reacquire it and return it to McKinney. Rather, Gannett must simply account for the profits it took out of Taos during the two years of Gannett ownership, and for the proceeds from the sale when Taos was sold to El Crepusculo. *See*, Dobbs, *Remedies* Sections 9.4, 4.4, at pp. 631, 257–258 (1973). All my rulings with respect to the method of accounting for income from The New Mexican apply to the accounting for income from Taos.

2. Taos Publishing Corp. was purchased from Gannett by El Crepusculo, Inc., a New Mexico corporation wholly owned by Robin McKinney.

3. GANNETT CORPORATE CHARGES AGAINST THE NEW MEXICAN. This category is composed of three disputed items: Gannett News Service (GNS), corporate overhead, and interest on Gannett borrowings. My rulings are contained in the March 17, 1981 letter at pp. 4–7. With respect to corporate overhead, I gave Gannett a choice to accept the 30% figure of my ruling or to request a hearing to afford it the opportunity to prove that expenses in excess of 30% were incurred by Gannett as the result of providing goods or services for the direct and exclusive use of The New Mexican. Gannett did not request the hearing and so the 30% figure applies.

■■■ ATTORNEY'S FEES. When I ordered rescission I expressed an intention to award attorney's fees to McKinney if at all possible. After considering the arguments of counsel I have concluded that I do not have the power to award ordinary attorney's fees in this case.

The issue of the allowance of attorney's fees in diversity cases is governed by state law. *Bickford v. John E. Mitchell Co.*, 595 F.2d 540, 545 (10th Cir.1979); *Toland v. Technicolor, Inc.*, 467 F.2d 1045, 1047 (10th Cir.1972). 6 Moore's Federal Practice, Para. 54.77(2) pp. 1712–13 (2d ed. 1976). The rule in New Mexico is that absent a statute or contractual provision allowing them, attorney's fees are not recoverable. *Aboud v. Adams*, 84 N.M. 683, 507 P.2d 430 (1973); *Tabet Lumber Co. v. Chalamidas*, 83 N.M. 172, 489 P.2d 885 (1971); *Lanier v. Securities Acceptance Corp.*, 74 N.M. 755, 398 P.2d 980 (1965). The only exceptions to this rule are narrowly defined. *Aboud v. Adams, supra; Gregg v. Gardner*, 73 N.M. 347, 388 P.2d 68 (1963).

Those exceptions are limited to the following actions: to dissolve an injunction; to prevent the unlawful disposition of property in a "semi-public" corporation; for a declaratory judgment to determine the rights and duties of officers, stockholders and directors of a corporation; and to bring money or property into a trust. None of these exceptions applies in this case.

McKinney relies on *Marron v. Wood*, 55 N.M. 367, 233 P.2d 1051 (1951) for the proposition that an award of attorney's fees is discretionary with the Court. However, that case involved prosecution of an action on behalf of a corporation by stockholders of record. The result of the litigation was of some benefit to the corporation and on that ground the court awarded attorney's fees to both sides against the corporation. Here, McKinney prosecuted the action for his own benefit, to redress repeated breaches of his contract. Thus, this case is not similar to *Marron* and does not fall into any of the exceptions in New Mexico cases on attorney's fees or into the line of cases discussed in "Attorneys' Fees and Other Expenses Incident to Controversy Respecting Internal Affairs of Corporation as Charge Against the Corporation," 152 A.L.R. 909, supplemented at 39 A.L.R.2d 580.

I cannot accept the rationale of the recent case of *Ward v. First National Bank in Albuquerque*, 94 N.M. 701, 616 P.2d 414 (1980) to support an award of attorney's fees in this case.

The "bad faith" exception developed in federal courts, *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *F.D. Rich Co., Inc. v. Industrial Lumber Co.*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974); *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), has not been adopted in New Mexico. An examination of these cases reveals that in each, jurisdiction was based on the existence of a federal question, not on diversity of citizenship of the parties. Thus, even though I have found that Gannett acted in bad faith in its willful refusal to honor McKinney's contract, New Mexico law does not recognize this as a ground for the award of attorney's fees.

■■■ DISCOVERY SANCTIONS. On June 24, 1981, Plaintiff filed a Motion for

Discovery Expenses under Rule 37(a)(4).[3] This motion is based on the fact that Plaintiff filed eight (8) separate motions to compel discovery during the pendency of this lawsuit. I have considered the memoranda and exhibits submitted by all parties, as well as the voluminous pleadings related to these discovery matters, and portions of the transcript of the proceedings. I rely, too, on my observations of the parties during the pretrial, trial, and post-trial proceedings, and on my memory of relevant events concerning these matters. The motion for expenses will be granted in part and denied in part, and a separate judgment will be filed herewith.

1. *First Motion to Compel.* When Plaintiff served his first set of interrogatories and requests for production on Gannett, Gannett's response was to make *pro forma* objections to nearly every question or request. Following some discussion between the parties, some of their differences were worked out, and Gannett narrowed down its objections to fewer of the items sought. At a pretrial conference before the Magistrate shortly after the first motion to compel was filed, the parties were encouraged to continue their attempts to work out their differences. After further consultation, Gannett maintained its objections to several interrogatories, the issues were briefed by the parties, and the Magistrate entered his order on January 26, 1979 requiring Gannett to answer all but two of the contested interrogatories. In his order, the Magistrate denied Plaintiff's demand

for sanctions. Gannett appealed that order to this Court and a hearing was held on January 11, 1980. At that hearing, counsel for Gannett withdrew its appeal with an explanation that Gannett's position in resisting discovery may have had "legal merit" but that it had no "practical merit." This is almost an admission that Gannett engaged in dilatory tactics very early on in this lawsuit. Despite Gannett's admission that its position had no "practical merit," literally hundreds of pages of paper were placed in the Court file discussing the "legal merit" thereof. These pages consume much of volume one of this file and represent many hours of attorney time and many days and weeks of delay.

Beyond that, it was discovered after several weeks of trial that Gannett had wilfully failed to produce certain internal financial documents that had been requested in Plaintiff's first set of interrogatories.

Rule 37(a)(4) provides that expenses are required unless the court finds that opposition to the motion to compel was justified. 4A Moore's Federal Practice, Para. 37.-02(10). I am unable to so find, thus, Plaintiff's reasonable expenses in obtaining the Magistrate's order and in preparing for argument to this Court will be awarded, including attorney's fees. In addition, I will award Plaintiff his reasonable expenses in connection with time spent during the trial when this matter came up again. I believe this is appropriate under Rule 37(b)(2).[4]

---

**3.** Rule 37(a)(4) provides, in pertinent part:

A party, upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling discovery ...

\* \* \* \* \* \*

If the motion is granted, the court shall, after opportunity for hearing, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.

\* \* \* \* \* \*

If the motion is granted in part and denied in part, the court may apportion the reason-

able expenses incurred in relation to the motion among the parties and persons in a just manner.

**4.** Rule 37(b)(2) provides, in pertinent part:

If a party ... fails to obey an order to provide or permit discovery ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

\* \* \* \* \* \*

(B) An order ... prohibiting (the disobedient party) from introducing designated matters in evidence;

\* \* \* \* \* \*

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising him or both to pay the reasonable

Gannett argues that it should be granted a hearing as provided by the Rule before sanctions may be imposed. The Rule, on its face, provides for a hearing, and some courts believe due process also requires a hearing before sanctions can be imposed. *Robison v. Transamerica Ins. Co.*, 368 F.2d 37 (10th Cir.1966) (construing Rule before 1970 amendments); *see also, Mixson v. Southern Bell Telephone & Telegraph Co.*, 334 F.Supp. 525 (N.D.Ga. 1971); *American Finance System Inc. v. Harlow*, 65 F.R.D. 94, 111–112 (D.Md. 1974); 8 Wright & Miller, Federal Practice and Procedure Section 2288 (1970); 4A Moore's Federal Practice Para. 37.02(10.–1). Some courts believe the hearing requirement is met where the parties have been given full opportunity to present their relative positions in writing. *Hayden Stone, Inc. v. Brode*, 508 F.2d 895 (7th Cir.1974); *Addington v. Mid-American Lines*, 77 F.R.D. 750 (W.D.Mo.1978). I subscribe to the belief that a hearing is required when demanded by the party against whom sanctions are imposed. This does not mean, however, that I will prolong this litigation by hauling the parties into court yet again. I believe ample opportunity to be heard has been afforded Gannett on this matter. On the issue of legal justification for Gannett's objections to the interrogatories, full briefing and argument was allowed both by the Magistrate and by this Court. When the matter came up again at trial, I conducted a full hearing outside the presence of the jury. Gannett has filed two legal briefs and presented fully its position in response to the present motion. Nothing would be gained by yet another court proceeding.

On the issue of reasonableness of expenses claimed by Plaintiff, I do not believe Gannett is entitled to a court hearing to quibble about what was done by Plaintiff's attorneys on each day devoted to gaining the order compelling answers to the first set of interrogatories.[5] Rather, I can make a determination as to what expenses are reasonable from the information available in the file. Plaintiff's Motion for Discovery Expenses contains a break-down as to hours, rates, fees and costs for each Motion to Compel filed. Plaintiff claims $17,998.50 in professional fees in connection with the first motion to compel, which represents a total of 287.6 hours spent by two attorneys and various support personnel (law clerks, paralegals, etc.). The hourly rates are the rates actually charged to and paid by McKinney at the time. The time includes researching, writing, revising and reviewing the motion itself; reviewing the response of opposing counsel; researching, writing, revising, and reviewing Plaintiff's reply to Gannett's response; appearing before the Magistrate and this Court to argue the motion; and actually enforcing the order. These are all reasonable items to include in the time spent on the motion. Also included is time spent conferring with opposing counsel in attempts to resolve these discovery matters. This, too, is a reasonable item because such efforts are a necessary step in obtaining a Rule 37 order. Also included is time spent during the trial when Gannett's noncompliance was discovered and dealt with. I will allow this item.

The time compiled does not include the time spent preparing the initial discovery request itself, nor does it include the additional time and expense incurred because of delay caused by Gannett's failure to permit discovery. Depositions had to be cancelled and rescheduled because of the delay in getting answers to this first set of interrogatories.

The total sought also includes costs amounting to $67.82 for photocopying and long distance calls.

expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

5. It should be noted that Gannett has not sought discovery relating to Plaintiff's expenses in connection with the motions to compel. Plaintiff's Motion for Discovery Expenses has been pending for almost two months. Gannett's latest suggestion, that it "be permitted to reserve its rights to obtain this discovery on costs" until after the Court has ruled on whether McKinney is entitled to recover them, will not be adopted.

In light of all the circumstances I have considered, as detailed above, I conclude that the amount of time spent prosecuting the first Motion to Compel is reasonable, and that the hourly fees are acceptable. I accept Mr. Marshall's representation that these fees and costs were actually billed to McKinney. Because Rule 11 of the Federal Rules of Civil Procedure imposes certain duties on attorneys who sign pleadings, and because the subject matter of the present motion concerns things which involve the attorneys personally, I believe my reliance is well placed.

Because Gannett was ordered to answer fully and produce writings requested in 34 interrogatories, and was relieved from responding to only two interrogatories, I will award the full amount requested by Plaintiff reduced by 5%, or $17,162.00.

2. *Second Motion to Compel.* I will not award Plaintiff his expenses in connection with this motion because the Magistrate denied the request for sanctions in his order, and no appeal was taken from that order. I will defer to the Magistrate's determination. The difference between this and the first motion to compel is that the first was appealed to this Court and only after voluminous briefing and an appearance before me did Gannett withdraw its objections. There, the Magistrate's order was reinstated, but sanctions are justified because of the further delay and expense incurred by the appeal—Gannett's failure to comply with the requests by Plaintiff with the order was extended by the appeal.

3. *Third Motion to Compel.* This motion was made after it became clear during depositions that Gannett would not allow its witnesses to answer questions about events occurring after the date this lawsuit was filed. The Magistrate agreed with Gannett and upheld a cut-off date. That decision was appealed and, after a hearing, I decided to set aside the Magistrate's order and remove the artificial cut-off date, and directed the parties to proceed under the rules of discovery. However, I did not make an order granting Plaintiff's motion. At the time it was impossible for me to do so because Plaintiff did not produce the precise questions he wanted answered. I could not rule that *all* questions about events after September 1, 1978 had to be answered because some of those questions may have been irrelevant. Thus, I thought it best to let the parties know my position: that Gannett and The New Mexican could not refuse to answer questions otherwise discoverable just because they concerned matters that occurred after September 1, 1978. I felt the issues were not sufficiently clear to give any more definite ruling, and I will deny Plaintiff's request for expenses related to this third motion to compel.

4. *Fourth Motion to Compel.* This motion was necessary because The New Mexican refused to provide discovery of information about occurrences after December 31, 1978 relating to its current finances, circulation and personnel. This information was sought in Plaintiff's second set of interrogatories. At a hearing I granted most of this motion and am unable to find that The New Mexican's refusal of discovery was justified. I had previously struck down an arbitrary cut-off date very similar to this one. Thus, I will award 85% of Plaintiff's expenses. '

For this motion, expenses of $1,444.25 were incurred by Plaintiff, so the award will be $1227.61.

5. *Fifth Motion to Compel.* This motion relates to Gannett's refusal to answer Plaintiff's second set of interrogatories. Gannett had objected to every one of the interrogatories. The questions related primarily to intercompany charges by Gannett to The New Mexican. At a hearing on this motion I granted it in large part, and am unable to find that Gannett's refusal was justified. I will award 75% of Plaintiff's expenses of $763.32, or $572.49.

6. *Sixth Motion to Compel.* This motion was granted without a hearing, thus, I will deny Plaintiff's request for sanctions.

7. *Seventh and Eighth Motions to Compel.* These motions were denied because I made certain rulings which rendered these motions moot. Therefore, Plaintiff's request for sanctions will be denied.

UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

SANTA FE, NEW MEXICO 87501

Santiago E. Campos
Judge

March 17, 1981

W.A. Sloan, Esq.
Victor Marshall, Esq.
Attorneys at Law
P.O. Box 1888
Albuquerque, New Mexico 87103

Jerry Wertheim, Esq.
Attorney at Law
P.O. Box 2228
Santa Fe, New Mexico 87501

William E. Snead, Esq.
Attorney at Law
P.O. Box 2226
Albuquerque, New Mexico 87103

John B. McCrory, Esq.
William Brandt, Esq.
Attorneys at Law
P.O. Box 1051
Rochester, New York 14603

RE: McKinney v. Gannett, et al.

U.S.D.C. No. CIV–78–630 C

Gentlemen:

Since October 1980 I have been pretty much occupied with the trial and disposition of criminal cases. The Speedy Trial Act mandates deadlines which must be met. In this district the four district judges not on senior status rotate turns in the trial and disposition of criminal cases. My turn started in October and I have just recently completed it. My attention is now back on this case and I want very much to put it behind me. I am sure all of you join me in this desire.

I have today filed my opinion on the first phase of this case. I enclose a copy for your information and files. In this opinion you will find my findings of fact and conclusions of law on the first phase.

In regard to the accounting part of this case, I will call it phase two, I have re-viewed the proceedings and will now list prior rulings as well as inform you of new rulings which I have now decided should be made.

PRIOR FINAL RULINGS

1. *Taos* (Paragraph I of Gannett's August 7, 1980 letter)—I ruled that *The Taos News* will be included in the accounting. Gannett will reimburse McKinney for re-purchase price paid plus interest, and will reimburse McKinney for what Gannett took out of Taos in the way of profits less reasonable expenses. Interest will accrue on these amounts until date of final order. Taos will be treated the same as The New Mexican on all disputed items (tax, corporate overhead, etc.).

2. *Alternative accounting for McKinney* (Paragraphs VI and VIII of Plaintiff's August 29 brief)—I rejected Plaintiff's proposed alternatives. McKinney will return all 300,000 shares (pre-split) of Gannett stock plus all dividends paid by Gannett on those shares, plus interest on the dividends.

3. *Capital expenditures* (Paragraph VIII of Plaintiff's August 29 brief)—the only challenged expenditure was for computers. I ruled that this was an appropriate capital expenditure which is in use at The New Mexican, thus, Gannett may deduct its actual cost. On this item, the standard I am using is that Defendant did not act in bad faith, and the expenditure is not the result of deliberate mismanagement.

4. *Salary and fringe benefits of Ryals and Jameson* (Paragraph IX of Plaintiff's August 29 brief)—these are reasonable expenses and may be deducted by Gannett. These Gannett men participated in breaches of McKinney's contract. I believe, however, that their larger and basic efforts were directed toward running *The New Mexican.*

5. *Gannett National Advertising Service (GNAS)* (Paragraph XI of Plaintiff's August 29 brief)—this is a service used by The New Mexican, therefore, Gannett may deduct an amount reasonably allocated to The New Mexican.

6. *Telecopier rent* (Paragraph XII of Plaintiff's August 29 brief)—this item was resolved by the parties. It is deductible by Gannett.

7. *Newsprint contracts* (Paragraph XIII of Plaintiff's August 29 brief)—this was agreed upon at the hearing and an appropriate order will be entered in the final decree.

8. *Pension Plan* (Paragraph XIV of Plaintiff's August 29 brief)—this was agreed upon at the hearing and an appropriate order will be entered in the final decree.

9. *Interest rate* (Paragraph XV of Plaintiff's August 29 brief)—this was agreed upon by the parties and will be calculated by them to date of final decree and, subsequently, closing.

10. *Update* (Paragraph XVI of Plaintiff's August 29 brief)—it was agreed that all figures will be updated to date of closing.

11. *Continuing jurisdiction* (Paragraph XVII of Plaintiff's August 29 brief)—I will continue jurisdiction for 90 days after closing or transfer of the property for the purpose of McKinney challenging the accuracy of figures used by Gannett in the accounting. After 90 days Rule 60(b) will come into play.

NEW FINAL RULINGS

A. *Actual expenditures made on behalf of The New Mexican.*

1. *Taxes* (Paragraph III of Gannett's August 7 letter)—the entire accounting will be done on a pre-tax basis. Thus, Gannett will not be allowed to deduct any amount for income taxes it paid on behalf of The New Mexican, and McKinney will not be allowed to deduct any income taxes he paid on his income from Gannett stock acquired in the merger.

2. *The New Mexican's expenses for this litigation* (Paragraph IV of Plaintiff's August 29 brief)—Gannett may not deduct any amount expended by The New Mexican for this litigation. This litigation was made necessary by Gannett's wilful, deliberate and wrongful breaches of its bargain with McKinney. The thought that McKinney

should bear the attorney fees and litigation expenses of those who acted to destroy his contract rights is repelling and incompatible with all equitable notions.

3. *Stephen Watkins' severance pay* (Paragraph X of Plaintiff's August 29 brief)—because the firing of Watkins was in breach of McKinney's contract and, therefore, wrongful, I will not allow Gannett to deduct the costs associated with Watkins' severance from The New Mexican. I reject Gannett's argument that apart from the breach of McKinney's contract Watkins' firing may have been a valid business judgment. This firing was a wilful breach.

B. *Corporate allocations made by Gannett against The New Mexican's account.*

This, I believe, is where we became bogged down at the last hearing. The category is composed of three disputed items: Gannett News Service (GNS), corporate overhead, and interest on Gannett borrowings.

Plaintiff is operating under the "lesser of cost to Gannett or value to The New Mexican" theory. I have decided that rule is unacceptable. Defendant Gannett urges me to consider only the reasonableness of the allocation in light of Gannett corporate realities or the value of similar services on the open market. I reject this suggestion also.

Each theory has conceptual appeal. Each theory can find justification in the facts. Gannett may be enriched by its interim ownership of The New Mexican unless I adopt the "cost to Gannett" rule. The allocation to The New Mexican has been estimated at .9% of corporate overhead expenses, yet Gannett's actual incremental costs probably have not increased that much.

McKinney may end up paying for unused or useless services unless I adopt the "value to The New Mexican" rule. For example, testimony showed that Gannett's corporate borrowings did not directly benefit The New Mexican except to a very small

extent. To the contrary, The New Mexican provided Gannett with quite a bit more cash than it required for expenditures. The New Mexican may have actually lowered Gannett's cash needs. On the other hand, Gannett's labor negotiators, accountants and legal staff may have been of great value to The New Mexican. Certainly, these services, actually used by The New Mexican, would have cost more than the allocation if purchased on the open market.

A perspective through another lens shows Gannett's allocations as reasonable because based on a formula which is uniform and consistently applied among all Gannett's subsidiaries. The New Mexican is only charged its fair share.

Further, there exists an overlay which affects consideration as to which party should, in fairness and good conscience, bear the costs of certain items. This overlay is the fact that Gannett wilfully, deliberately and wrongfully engaged in the conduct which breached the bargain and moved McKinney to seek rescission and an accounting. A more detailed exposition of my views on this is contained in the opinion which I have filed today. This factor does not bear at all on the allocation of some items in the accounting. It does exert influence in relation to the allocation of others; for example, costs of litigation of The New Mexican and severance pay for Watkins, both mentioned above.

With all of the above in mind, I have decided to treat each of the three items of corporate allocations: GNS, corporate overhead, and interest on Gannett borrowings on an *ad hoc* basis. Each of these items will be allocated after consideration of equitable factors related to that particular item.

1. *GNS* (Paragraph II of Defendant Gannett's September 8, 1980 letter)—it is my feeling that while The New Mexican still had both AP and UPI, the addition of GNS was unnecessary and was merely self-serving to the Gannett corporation. After UPI was dropped, it is Plaintiff's contention that GNS did not add much in the way of news to the newspaper because the stories are magazine-type feature stories of less topical and more narrow interest. When we ended the last hearing Plaintiff was entering an area of proof which I now believe is irrelevant, that is, GNS was of zero or negative value to The New Mexican, and actually has contributed to its decline in circulation. I now rule that Gannett may deduct a fair allocation for GNS only from the date UPI was dropped. I believe this was some time in 1978. GNS is a service actually used by The New Mexican, and Gannett's decision to drop UPI and install GNS was neither in bad faith nor the result of deliberate mismanagement. Up until UPI was dropped, the addition of GNS was suplusage, thus, Gannett may not deduct any amount for that time period.

2. *Corporate overhead* (Paragraph II of Gannett's September 8, 1980 letter)—this item consists of multiple sub-items. Rather than consider each sub-item individually, I will rule that of the total amount of corporate overhead which Gannett has allocated to The New Mexican I will allow Gannett to deduct 30% thereof from The New Mexican income which must be returned by Gannett to McKinney. I will, however, if requested by Gannett, afford it the opportunity to prove by a preponderance of the evidence that expenses in excess of 30% of the total amount were incurred by Gannett in this category as the result of providing goods or services for the *direct and exclusive use* of The New Mexican. Direct and exclusive use of The New Mexican is distinguished from goods or services provided by corporate headquarters to advance the interests of Gannett enterprises in general without specific relation to The New Mexican.

An example of services provided for the direct and exclusive use of The New Mexican would be the services rendered by Gannett's labor lawyers during the union negotiations. An example of expense for services incurred by corporate headquarters which will not be allowed Gannett is that incurred generally for corporate officers' salaries.

Should Gannett request the hearing for the purpose indicated above, it is not my intention to hear any evidence as to whether the goods or services "benefited" The New Mexican. The issue will be: Were the goods or services for the *direct and exclusive use* of The New Mexican?

The procedure or plan outlined on this aspect of the accounting is not a Solomonic cop-out. Nor is it as arbitrary as, at first blush, it might appear. It takes into consideration the fact that certain goods or services within the "corporate overhead" category were provided by Gannett for the direct and exclusive use of The New Mexican. As to those expenses which were not for the direct and exclusive use of The New Mexican (if direct and exclusive use expenses do not reach 30% of the entire amount), it takes into consideration that a portion of all expenses in this category arose during the early times of the McKinney-Gannett relationship—the "honeymoon" period, so to speak. This was a time when McKinney was yet enjoying that which Gannett had bargained to him and that which he had bargained for. The procedure virtually eliminates the abhorent possibility of having McKinney pay a part of the salaries and perquisites enjoyed by Gannett officialdom some of whom, in the later stages of the relationship, were, in violation of his contract rights, moving to "get him off the masthead." Also, this procedure addresses and minimizes the danger of unjust enrichment by Gannett. This would be a real danger if I allowed the entire amount claimed by Gannett as a deduction from The New Mexican income. And the procedure pragmatically recognizes and bypasses the extreme difficulty of identifying and developing perfectly discrete legal principles and factual predicates for allocation of *each* dollar treated in this category. In summary, it is about the best that my sense of equity reveals to me that I am able to do on "corporate overhead."

3. *Interest on Gannett borrowings* (Paragraph II of Gannett's September 8, 1980 letter). Court's Exhibits 113 and 104A. Gannett contends that if all cash needs of The New Mexican were considered, plus the cash needs of Gannett to pay McKinney's dividends, then the result would have been an interest charge of $201,130.68 through June 1980 attributable to The New Mexican. However, Plaintiff pointed out that the "Net Profit After Taxes" figure includes some items which are not properly deducted from gross profits. One of these is the contested interest allocation of $164,733. Another is the approximately $518,000 for attorneys fees for this litigation. Also, The New Mexican's working capital has been reduced by approximately $687,000. These three items alone, if added back in, would result in a positive cash flow. Additionally, the amount paid to McKinney in cash dividends should not be considered as a cash need of The New Mexican as sought to be done in Court's Exhibit 113 (an exhibit prepared by Gannett). The cash need was that of Gannett in connection with its acquisition of The New Mexican. Court's Exhibit 113, profferred to show cash needs of The New Mexican and thus justify interest charges, tends to mislead.

Further, insofar as dividends paid to McKinney are concerned, these will be recouped by Gannett *with interest* in this accounting. Interest, if any, paid by Gannett on borrowings to pay McKinney, if any, will be recouped by Gannett in the accounting.

In summary, I find that The New Mexican brought cash into Gannett and was not a "cash drain" as many other newly-acquired subsidiaries are. Additionally, Gannett has not proven that any of its borrowings directly benefited The New Mexico or, put another way, Gannett has not shown that its ownership of The New Mexican actually required it to borrow on The New Mexican's behalf. Thus, I will rule that none of the interest allocation of $164,733 may be deducted by Gannett.

At this time I will order Gannett to account for all amounts taken out of The New Mexican including dividends and the intercompany balances, and to deduct for all business expenses reasonably incurred in managing the property according to all my previous rulings and the rulings contained in this letter. This accounting should be

filed and delivered to Plaintiff's attorneys no later than 5:00 P.M. March 27, 1981. Following that, Plaintiff will be given until 5:00 P.M. April 10, 1981 to file any challenges it may have to Gannett's accounting.

Should Gannett request a hearing to attempt proof under Paragraph B–2 above, it will, by March 27, 1981, or sooner if possible, notify me and counsel for McKinney. I will then arrange a conference with counsel in the nature of pre-trial. This can be done over the telephone. If Gannett desires this hearing, counsel should be prepared to specify which specific items will be submitted to proof, which witnesses will be presented, which exhibits will be offered, etc. Counsel for Gannett should also be prepared to submit to full discovery on these issues.

In respect to the Plaintiff's sixth Motion to Compel Discovery, seventh Motion to Compel Discovery and eighth Motion to Compel Discovery, I will deny the seventh and eighth motions. I believe my rulings to date have now made these two motions moot.

The sixth Motion to Compel Production of Documents will be granted. I conclude that under Rule 27(b), Fed.R.Civ.P., I should, in order to "avoid a failure or delay of justice, ... make an order ... of the character provided in Rule 34 ..." allowing the production sought. The confidentiality stipulation will still apply. Counsel for Plaintiff will please prepare an order on this.

In September 1980 I ordered the return of certain affidavits filed by McKinney, Ryals and The New Mexican. I decided that I should not permit the official court file to become the depository for propaganda in controversies which are not properly in my court. The McKinney affidavit came as a surprise. I permitted it to be filed when presented because I was under the impression it was to be used in support of an application for an order of court to permit McKinney or his counsel to communicate with employees of The New Mexican. That application was never made. The Ryals affidavit and the affidavit of employees of The New Mexican did not relate to any pending application for relief in court. These were, as I surmise, filed for the sole purpose of providing grist for the media mills in relation to controversies which are out on the street and not in my court. I do not believe this to be a proper use of the official court file.

If any of you have any questions or suggestions, please feel free to arrange a telephone conference among you and me so that we can engage discussion.

My best personal regards.

Sincerely,

SANTIAGO E. CAMPOS
UNITED STATES DISTRICT JUDGE

Enclosure

### FINAL JUDGMENT

THIS ACTION came on for trial on March 24, 1980 before the Court and a Jury, the Honorable Santiago E. Campos, District Judge, Presiding. The issues in the Amended Complaint were duly tried, and prior to the submission of the case to the Jury, and for the reasons stated by the Court, all causes of action against Defendants The New Mexican, Inc. (hereafter "The New Mexican") and Gannett Co., Inc. (hereafter "Gannett") were dismissed, except the first and third causes of action as asserted against Gannett. These two causes of action against Gannett were submitted to the Jury for resolution, and the Jury duly rendered its verdicts on June 27, 1980, finding for Gannett on the third cause of action and finding for Plaintiff, Robert M. McKinney (hereafter "McKinney") on the first cause of action. Thereafter, on June 30, 1980, in the exercise of its equitable power, the Court determined that McKinney could be awarded equitable relief, and the Court concurred in the jury verdicts and has rendered its own findings of fact and conclusions of law in a Memorandum Opinion dated March 17, 1981.

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that Plaintiff, Robert M. McKinney have judgment against Defendants Gannett and The New Mexican and each of them as follows:

I. McKinney hereby is awarded, at his election, rescission of the "Agreement and Plan of Reorganization dated December 18, 1975 between Gannett Co., Inc. and the Shareholders of The New Mexican, Inc. and The New Mexican, Inc.," as supplemented, amended, and executed on February 27, 1976; the "Agreement and Plan of Reorganization dated February 27, 1976 between Gannett Co., Inc. and the Shareholder of Taos Publishing Corporation and Taos Publishing Corporation," as supplemented, amended, and executed on February 27, 1976; and all instruments executed pursuant to the above (hereafter collectively referred to as the "Merger"). Rescission shall be upon the following terms:

(A) The "rescission election" shall mean McKinney's election to rescind the Merger in accordance with the terms and conditions set forth in this Judgment. That election shall be made by telegram or telex sent by the attorneys for McKinney to the attorneys for Gannett, followed immediately by a written notice, forwarded by express mail to the aforesaid attorneys. Counsel for Plaintiff will, upon sending the aforesaid telegram or telex, give immediate telephone notice of the rescission election to said attorneys.

(B) McKinney may exercise the rescission election only during either of the following periods:

(1) The 60–day period commencing the day following expiration of the time to appeal, as determined by the Federal Rules of Civil Procedure, provided that none of the parties to the action has filed a timely notice of appeal; or

(2) The 60–day period commencing on the date of issuance of a mandate of the United States Court of Appeals for the Tenth Circuit affirming McKinney's right to the rescission election.

(C) Upon exercise of McKinney's rescission election, the parties shall agree to a place of Closing and a Closing Date, which date shall be no earlier than the 15th day of the month following the month in which notice of the rescission election is given by McKinney. If no agreement can be reached, the Closing will take place on the first Wednesday following said 15th day of the month, at 10:00 A.M., at the offices of Jones, Gallegos, Snead & Wertheim, 215 Lincoln Avenue, Santa Fe, New Mexico.

(D) At the Closing, the following transactions shall occur in the following order:

(1) Gannett shall deliver to McKinney a certificate or certificates for 700 shares of the common stock of The New Mexican (said 700 shares being all of The New Mexican's issued and outstanding shares).

(2) McKinney shall deliver to Gannett a certificate or certificates for 450,000 shares of Gannett common stock, adjusted for any stock splits or stock dividends occurring between the date of entry of this Judgment and the Closing Date.

(3) Gannett shall deliver to The New Mexican a certified check, payable to The New Mexican, or cause funds to be transferred to an account designated by The New Mexican. The amount of the check or transfer shall be calculated to the Closing Date, and shall reflect the return by Gannett to The New Mexican of, among other things, pre-tax earnings pursuant to the rescission accounting principles heretofore established by the Court or agreed to by the parties. As of March 1, 1981, this amount was Four Million, Eighty-Seven Thousand, Five Hundred Eighteen Dollars ($4,087,518), comprised of Three Million, Five Hundred Ninety-Six Thousand, One Hundred Dollars ($3,596,100) in principal amount and Four Hundred Ninety-One Thousand, Four Hundred Eighteen Dollars ($491,418) of interest calculated at the prime commercial lending rate of The Morgan Guaranty Trust Company of New York, as it changes from time to time.

(4) Gannett shall deliver to Taos Publishing Corporation a check payable to Taos Publishing Corporation, or cause funds to be transferred on the Closing Date to an account designated by Taos Publishing Corporation. The amount of the check or transfer shall be calculated to the Closing Date and shall reflect the return by Gannett to Taos Publishing Corporation of pretax earnings pursuant to the rescission ac-

counting principles heretofore established by the Court or agreed to by the parties. As of March 1, 1981, this amount was One Hundred Ninety-Eight Thousand, Two Hundred Fifty-Eight Dollars ($198,258), comprised of One Hundred Fifty-Four Thousand, One Hundred Forty-One Dollars ($154,141) in principal amount and Forty-Four Thousand, One Hundred Seventeen Dollars ($44,117) of interest calculated at the prime commercial lending rate of The Morgan Guaranty Trust Company of New York, as it changes from time to time.

(5) Gannett shall deliver to El Crepusculo, Inc. a certified check, payable to El Crepusculo, Inc., or cause funds to be transferred on the Closing Date to an account designated by El Crepusculo, Inc. The amount of the check or transfer shall be calculated to the Closing Date, and shall reflect an accounting by Gannett for the proceeds of Gannett's sale of Taos Publishing Corporation. As of March 1, 1981, this amount was Four Hundred Eighty-One Thousand, Six Hundred Sixty-Five Thousand Dollars ($481,665), comprised of Three Hundred Fifty Thousand Dollars ($350,000) in principal amount and One Hundred Thirty-One Thousand, Six Hundred Sixty-Five Dollars ($131,665) of interest calculated at the prime commercial lending rate of The Morgan Guaranty Trust Company of New York, as it changes from time to time.

(6) McKinney shall deliver to Gannett a certified check, payable to Gannett, or cause funds to be transferred on the Closing Date to an account designated by Gannett. The amount of the check or transfer shall be calculated to the Closing Date, and shall reflect the repayment of dividends pursuant to the rescission accounting principles heretofore established by the Court or agreed to by the parties. As of March 1, 1981, this amount was Two Million, Seven Hundred Ninety-Two Thousand, One Hundred Fifty-Six Dollars ($2,792,156), comprised of Two Million, One Hundred Ninety Thousand Dollars ($2,190,000) in dividends and Six Hundred Two Thousand, One Hundred Fifty-Six Dollars ($602,156) of interest calculated at the prime commercial lending rate of The Morgan Guaranty

Trust Company of New York, as it changes from time to time.

(E) Unpaid portions of principal in (D) above shall bear interest until paid, at the prime commercial lending rate of The Morgan Guaranty Trust Company of New York, as it changes from time to time.

(F)(1) Each certificate representing the share or shares to be transferred in accordance with this Judgment shall be duly endorsed to the party to which they are to be delivered or be accompanied by a stock power duly endorsed to the party to which they are delivered, with signatures in each case guaranteed by a bank or by a member firm of The New York Stock Exchange, Inc., and shall otherwise be in proper form for transfer. All necessary transfer tax stamps, the cost of which shall be absorbed by the party receiving the stock, shall be affixed to such certificates.

(2) The transactions set forth in paragraphs I(D)(1) and (3) shall constitute full and complete satisfaction of all of Gannett's obligations to El Nuevo Mexicano, Inc. arising from this judgment and rescission accounting, and McKinney will cause El Nuevo Mexicano, Inc. to execute a release to Gannett consistent therewith.

II. After McKinney gives notice pursuant to I(A) above, Gannett shall not vote the shares of The New Mexican, and there shall be no further inter-company transactions between Gannett and The New Mexican unless all the parties agree otherwise. As of the Closing Date, pursuant to this Judgment and without further order of the Court, the Merger shall be rescinded, become null and void, and be of no further effect.

III. If McKinney has not exercised his rescission election within the time periods specified in Section I(B), or willfully fails or materially fails to perform his obligations under Sections I(D)(2) and (6), then his rescission election shall be of no further force and effect, and Gannett shall be entitled to a satisfaction of judgment.

IV. Until McKinney's right to rescind is exercised or expires, he shall be provided with documents concerning the financial and personnel affairs of The New Mexican,

including The New Mexican's monthly financial statements; budget-progress plan (as drafted, finalized, or revised); reports of the Audit Bureau of Circulation concerning The New Mexican. Upon McKinney's request to the President or General Manager of The New Mexican, personnel records will be made available to him or his designated representative for review and/or copying at The New Mexican, or as otherwise agreed.

V. In the event that McKinney does not exercise the rescission election or is unable to comply with all the provisions of this Judgment in regard to rescission, all the agreements of the parties shall remain in full force and effect.

VI. On the Closing Date, Gannett shall assign, insofar as it is able, or otherwise relinquish to The New Mexican or its designee Gannett's right to receive the following amounts of newsprint under the contracts in force at the date notice is given pursuant to I(A) above:

| Supplier | Tons Per Year |
| --- | --- |
| Powell River Alberni | 600 |
| Crofton | 400 |
| Southwest Forest Products | 650 |

The New Mexican or its designee shall be responsible for payment of the contract prices for all newsprint ordered after the Closing Date. If at the time of the rescission election Gannett has no contract with a supplier listed above, it shall assign, insofar as it is able, or otherwise relinquish to The New Mexican or its designee a like tonnage from another supplier or suppliers selected by The New Mexican.

VII. As soon as is practical after the Closing Date, Gannett will have determined by Towers, Perrin, Forster & Crosby, an actuarial consulting firm, or any other actuarial consulting firm selected by McKinney, the following:

(a) The present value of accrued pension benefits earned to the closing date payable at normal retirement age under the Gannett Retirement Plan for all active participants and vested terminated participants attributable to The New Mexican, Inc. Such present value shall be determined on rates established by the Pension Benefit Guaranty Corporation for plan terminations as of the Closing Date. Gannett shall be responsible for accrued pension benefits earned by such participants other than through employment with The New Mexican, Inc.

(b) The asset level attributable to The New Mexican in the Gannett Retirement Plan, reflecting the prior New Mexican Plan asset transfer to the Gannett Retirement Plan, actual contributions made by or on behalf of The New Mexican to the Closing Date, and actual benefit payments made and/or the present value of benefits to be made to retired employees or their beneficiaries of The New Mexican. This determination will also reflect an allocation of investment earnings and expenses to the Closing Date.

(c) Upon such determinations being made satisfactory to Gannett and McKinney, Gannett will take such action or cause such action to be taken, to transfer assets equal to the present value of accrued benefits determined in accordance with Paragraph (a) above to a defined benefit retirement plan established by The New Mexican which is qualified under Section 401(a) of the Internal Revenue Code.

(d) The excess, if any, of (a) over (b) above shall be paid by The New Mexican to the Gannett Retirement Plan within ten (10) days of the transfer of the assets.

(e) The charges made by Towers, Perrin, Forster & Crosby, or by the actuarial firm selected by McKinney for these calculations will be paid by The New Mexican. If McKinney selects a firm other than Towers, Perrin, Forster & Crosby, Gannett shall have the right to use Towers, Perrin, Forster & Crosby to verify the calculations of such firm, and the expense of Towers, Perrin, Forster & Crosby shall be borne by Gannett.

VIII. Inasmuch as the payments specified in I(D) are based upon the accuracy of the unaudited financial statements provided by the Defendants, the Court will retain jurisdiction of this case for ninety (90) days after the Closing Date for the purpose of allowing McKinney an opportunity to ex-

amine the records of the Defendants and verify or challenge the accuracy of the figures used in the accounting. Any time limitations of the type found in Rule 60(b) of the Federal Rules of Civil Procedure shall commence as of the Closing Date.

IX. The New Mexican shall take nothing on its counterclaim against McKinney, which is dismissed on the merits with prejudice.

X. McKinney shall take nothing on his claim for actual and compensatory damages ancillary to rescission, and said claim is denied with prejudice.

XI. McKinney shall take nothing on his claim for punitive or exemplary damages, and said claim is denied with prejudice.

XII. McKinney's claim for recovery of his attorneys' fees and expenses is denied except in connection with Rule 37 sanctions as discussed in the Court's Memorandum Opinion filed this date.

XIII. Costs shall be taxed against Gannett.

XIV. This Judgment shall be binding upon each of the parties and each party's successors in interest.

XV. This Judgment is a final judgment under Rule 54(a) of the Federal Rules of Civil Procedure and is immediately appealable and enforceable. This Judgment adjudicates all of the claims, rights, and liabilities of all the parties to this action.

### JUDGMENT

THE COURT having granted in part Plaintiff's Motion for Discovery Expenses and having filed its Memorandum Opinion containing findings of fact and conclusions of law in connection with this matter,

JUDGMENT IS HEREBY GRANTED for Plaintiff Robert M. McKinney and against Defendants Gannett Co., Inc. and The New Mexican, Inc., and each of them, in the total amount of $18,962.10.